## OLD DOMINION COPPER MINING AND SMELTING COMPANY *v.* LEWISOHN.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 206.    Argued April 16, 20, 1908.—Decided May 18, 1908.

A corporation remains unchanged and unaffected in its identity by changes in its members, nor does it change its identity by increasing its capital stock; and its legal action is equally binding on itself after such an increase as it was prior thereto.

A corporation should not be allowed to disregard its assent previously given in order to charge a single member with the whole results of a transaction to which the greater part—in this case thirteen-fifteenths—of its stock were parties for the benefit of the guilty and innocent alike.

148 Fed. Rep. 1020, affirmed.

THE facts are stated in the opinion.

*Mr. Louis D. Brandeis* and *Mr. Edward F. McClennen*, with whom *Mr. William H. Dunbar* was on the brief, for petitioner:

The sale was made by promoters to a corporation organized for the purpose and exclusively controlled and represented by them.

A corporation is entitled to relief against a sale made to it by promoters who themselves control the corporation unless all persons entitled to object acquiesce.

The rule is universal that if a vendor stands in a fiduciary relation to his vendee the sale is voidable, unless independently acquiesced in by the latter with full knowledge of all material

facts.  *Wardell* v. *Railroad Co.*, 103 U. S. 651, 658; *Thomas* v. *Peoria & R. I. R. Co.*, 36 Fed. Rep. 808; *Tyrrell* v. *Bank of London*, 10 H. L. C. 26; *Aberdeen Railway Co.* v. *Blaikie*, 1 McQueen, 461.

A promoter stands in a fiduciary relation to the corporation he promotes, and is subject to this rule.  *Dickerman* v. *Northern Trust Co.*, 176 U. S. 181; *Teiser* v. *U. S. Board & Paper Co.*, 107 Fed. Rep. 340; *Hayward* v. *Leeson*, 176 Massachusetts, 310; *Old Dominion Copper Co.* v. *Bigelow*, 188 Massachusetts, 315; *Central Trust Co.* v. *East Tenn. Land Co.*, 116 Fed. Rep. 743; *Yale Gas Stove Co.* v. *Wilcox*, 64 Connecticut, 101; *Chandler* v. *Bacon*, 30 Fed. Rep. 538; *Burbank* v. *Dennis*, 101 California, 90; *The Telegraph* v. *Loetscher*, 127 Iowa, 383; *Hinckley* v. *Sac Oil & Pipe Line Co.*, 132 Iowa, 396; *Camden Land Co.* v. *Lewis*, 101 Maine, 78; *Fred Macey Co.* v. *Macey*, 143 Michigan, 138; *South Joplin Land Co.* v. *Case*, 104 Missouri, 572; *Exter* v. *Sawyer*, 146 Missouri, 302; *Woodbury Heights Land Co.* v. *Loudenslager*, 55 N. J. Eq. 78; *S. C.*, 56 N. J. Eq. 411; *S. C.*, 58 N. J. Eq. 556; *First Avenue Land Co.* v. *Hildebrand*, 103 Wisconsin, 530; *Hebgen* v. *Koeffler*, 97 Wisconsin, 313; *Hitchcock* v. *Hustace*, 14 Hawaii, 232; *Erlanger* v. *New Sombrero Co.*, 3 App. Cas. 1218; *Gluckstein* v. *Barnes*, A. C. 240.

The liability of the promoter exists independently of any misrepresentation, of the issue of a prospectus, or of the particular method in which the transaction is carried out.  *Gilman C. & S. R. R. Co.* v. *Kelly*, 77 Illinois, 426, 435; *Dutton* v. *Willner*, 52 N. Y. 312; *Hayward* v. *Leeson*, 176 Massachusetts, 310; *Salomon* v. *Salomon*, A. C. 22; *Tompkins* v. *Sperry*, 96 Maryland, 560.

The duty of the promoters extends to all persons whom they bring in as original subscribers for stock, whether before or after the transaction complained of.  Morawetz on Private Corporations (2d ed.), § 294; *Dickerman* v. *Northern Trust Co.*, 176 U. S. 181; *Geiser* v. *U. S. Board & Paper Co.*, 107 Fed. Rep. 340, 348; *Chandler* v. *Bacon*, 30 Fed. Rep. 538; *Hayward* v. *Leeson*, 176 Massachusetts, 310, 320; *South Joplin Land Co.* v.

*Case,* 104 Missouri, 572, 579; *In re Leeds & Hanley Theatres,* 2 Ch. 809.

The subscribers for the twenty thousand shares issued for cash were persons interested, who did not acquiesce. *Dickerman* v. *Northern Trust Co.,* 176 U. S. 181.

The members of the Old Dominion Syndicate were persons interested, who did not acquiesce. *Arnold* v. *Searing,* 67 Atl. Rep. 831, 832; *Brewster* v. *Hatch,* 122 N. Y. 349.

There was clearly no disclosure and therefore no acquiescence if persons other than the promoters themselves were concerned. *Gluckstein* v. *Barnes,* A. C. 240, 249.

*Mr. Eugene Treadwell,* with whom *Mr. Edward Lauterbach* was on the brief, for respondents:

The company is without equity in the premises. There was no fraud on the company. Since at the date of the transaction sought to be rescinded, Bigelow and Lewisohn owned all the stock of the complainant, constituted the entire stockholding interest of the company and received all of the stock of the company issued, including the stock issued by the complainant for the property in question, there was no one who could in equity complain. *Foster* v. *Seymour,* 23 Fed. Rep. 65; *McCracken* v. *Robison,* 57 Fed. Rep. 375; *Stewart* v. *St. Louis &c. R. Co.,* 41 Fed. Rep. 736, 738; *Dupont* v. *Tilden,* 42 Fed. Rep. 87; *Wood* v. *Corry Water Works,* 44 Fed. Rep. 146, 149; *Fort Madison Bank* v. *Alden,* 129 U. S. 373, 378; *Barr* v. *N. Y., L. E. & W. R. R. Co.,* 125 N. Y. 263, 273; *Seymour* v. *Spring Forest Assn.,* 144 N. Y. 333; *Thornton* v. *Wabash Ry. Co.,* 81 N. Y. 462, 467; *Parsons* v. *Hayes,* 14 Abb. N. C. 419, 434; *King* v. *Barnes,* 109 N. Y. 267; *Insurance Press* v. *Montauk Wire Co.,* 103 App. Div. (N. Y.) 472; *Blum* v. *Whitney,* 185 N. Y. 232; *Higgins* v. *Lansingh,* 154 Illinois, 301, 331, 336; *Spaulding and Another* v. *North Milwaukee Town Site Co.,* 106 Wisconsin, 481, 488; *In re Ambrose,* L. R. 14 Ch. D. 390, 395, 399; *In re British Seamless Paper Co.,* L. R. 17 Ch. D. 467; *Salomon* v. *Salomon,* L. R. (1897) A. C. 22; Cook on Corpora-

tions (5th ed.) §§ 46, 47, 649; 1 Morawetz on Priv. Corp. (2d ed.) § 290; 3 Pomeroy on Eq. Jurisp. (3d ed.) § 1092.

The company was not injured by the exchange on July 11, 1895, for property duly received, of 130,000 of the 150,000 authorized shares of the capital stock, in the absence of any cash capital or other shares outstanding, either issued, contracted for or offered.

The company was not injured by the subsequent offer for sale on July 18, 1895, of the remaining 20,000 shares of its authorized capital stock at par for cash, as it duly received and always retained the entire amount, $500,000, in cash, no part ever going to Lewisohn or Bigelow in any form.

The company, therefore, suffered no injury.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a bill in equity brought by the petitioner to rescind a sale to it of certain mining rights and land by the defendants' testator, or in the alternative to recover damages for the sale. The bill was demurred to and the demurrer was sustained. 136 Fed. Rep. 915. Then the bill was amended and again demurred to, and again the demurrer was sustained, and the bill was dismissed. This decree was affirmed by the Circuit Court of Appeals. 148 Fed. Rep. 1020; 79 C. C. A. 534. The ground of the petitioner's case is that Lewisohn, the deceased, and one Bigelow, as promoters, formed the petitioner that they might sell certain properties to it at a profit, that they made their sale while they owned all the stock issued, but in contemplation of a large further issue to the public without disclosure of their profit, and that such an issue in fact was made. The Supreme Judicial Court of Massachusetts has held the plaintiff entitled to recover from Bigelow upon a substantially similar bill. 188 Massachusetts, 315.

The facts alleged are as follows: The property embraced in the plan was the mining property of the Old Dominion Copper Company of Baltimore, and also the mining rights and land

now in question, the latter being held by one Keyser, for the benefit of himself and of the executors of one Simpson, who with Keyser owned the stock of the Baltimore company. Bigelow and Lewisohn, in May and June, 1895, obtained options from Simpson's executors and Keyser for the purchase of the stock and the property now in question. They also formed a syndicate to carry out their plan, with the agreement that the money subscribed by the members should be used for the purchase and the sale to a new corporation, at a large advance, and that the members, in the proportion of their subscriptions, should receive in cash or in stock of the new corporation the profit made by the sale. On May 28, 1895, Bigelow paid Simpson's executors for their stock on behalf of the syndicate, in cash and notes of himself and Lewisohn, and in June Keyser was paid in the same way.

On July 8, 1895, Bigelow and Lewisohn started the plaintiff corporation, the seven members being their nominees and tools. The next day the stock of the company was increased to 150,-000 shares of twenty-five dollars each, officers were elected, and the corporation became duly organized. July 11, pursuant to instructions, some of the officers resigned, and Bigelow and Lewisohn and three other absent members of the syndicate came in. Thereupon an offer was received from the Baltimore company, the stock of which had been bought, as stated, by Bigelow and Lewisohn, to sell substantially all its property for 100,000 shares of the plaintiff company. The offer was accepted, and then Lewisohn offered to sell the real estate now in question, obtained from Keyser, for 30,000 shares, to be issued to Bigelow and himself. This also was accepted and possession of all the mining property was delivered the next day. The sales "were consummated" by delivery of deeds, and afterwards, on July 18, to raise working capital, it was voted to offer the remaining 20,000 shares to the public at par, and they were taken by subscribers who did not know of the profit made by Bigelow and Lewisohn and the syndicate. On September 18, the 100,000 and 30,000

shares were issued, and it was voted to issue the 20,000 when paid for. The bill alleges that the property of the Baltimore company was not worth more than $1,000,000, the sum paid for its stock, and the property here concerned not over $5,000, as Bigelow and Lewisohn knew. The market value of the petitioner's stock was less than par, so that the price paid was $2,500,000, it is said, for the Baltimore company's property and $750,000 for that here concerned. Whether this view of the price paid is correct, it is unnecessary to decide.

Of the stock in the petitioner received by Bigelow and Lewisohn or their Baltimore corporation, 40,000 shares went to the syndicate as profit, and the members had their choice of receiving a like additional number of shares or the repayment of their original subscription. As pretty nearly all took the stock, the syndicate received about 80,000 shares. The remaining 20,000 of the stock paid to the Baltimore company, Bigelow and Lewisohn divided, the plaintiff believes, without the knowledge of the syndicate. The 30,000 shares received for the property now in question they also divided. Thus the plans of Bigelow and Lewisohn were carried out.

The argument for the petitioner is that all would admit that the promoters (assuming the English phrase to be well applied) stood in a fiduciary relation to it, if, when the transaction took place, there were members who were not informed of the profits made and who did not acquiesce, and that the same obligation of good faith extends down to the time of the later subscriptions, which it was the promoters' plan to obtain. It is an argument that has commanded the assent of at least one court, and is stated at length in the decision. But the courts do not agree. There is no authority binding upon us and in point. The general observations in *Dickerman* v. *Northern Trust Co.*, 176 U. S. 181, were *obiter*, and do not dispose of the case. Without spending time upon the many dicta that were quoted to us, we shall endeavor to weigh the considerations on one side and the other afresh.

The difficulty that meets the petitioner at the outset is that

it has assented to the transaction with the full knowledge of
the facts. It is said, to be sure, that on September 18, when
the shares were issued to the sellers, there were already sub-
scribers to the 20,000 shares that the public took. But this
does not appear from the bill, unless it should be inferred from
the ambiguous statement that on that day it was voted to
issue those shares "to persons who had subscribed therefor,"
upon receiving payment, and that the shares "were thereafter.
duly issued to said persons," etc. The words "had subscribed"
may refer to the time of issue and be equivalent to "should
have subscribed" or may refer to an already past event. But
that hardly matters. The contract had been made and the
property delivered on July 11 and 12, when Bigelow, Lewisohn
and some other members of the syndicate held all the outstand-
ing stock, and it is alleged in terms that the sales were con-
summated before the vote of July 18 to offer the stock to the
public had been passed.

At the time of the sale to the plaintiff, then, there was no
wrong done to any one. Bigelow, Lewisohn and their syndi-
cate were on both sides of the bargain, and they might issue
to themselves as much stock in their corporation as they liked
in exchange for their conveyance of their land. *Salomon* v.
*Salomon & Co.* [1897], A. C. 22; *Blum* v. *Whitney*, 185 N. Y.
232; *Tompkins* v. *Sperry*, 96 Maryland, 560. If there was a
wrong it was when the innocent public subscribed. But what
one would expect to find, if a wrong happened then, would not
be that the sale became a breach of duty to the corporation
*nunc pro tunc*, but that the invitation to the public without
disclosure, when acted upon, became a fraud upon the sub-
scribers from an equitable point of view, accompanied by what
they might treat as damage. For it is only by virtue of the
innocent subscribers' position and the promoter's invitation
that the corporation has any pretense for a standing in court.
If the promoters after starting their scheme had sold their
stock before any subscriptions were taken, and then the pur-
chasers of their stock with notice had invited the public to

come in and it did, we do not see how the company could maintain this suit. If it could not then, we do not see how it can now.

But it is said that from a business point of view the agree-ment was not made merely to bind the corporation as it then was, with only forty shares issued, but to bind the corporation when it should have a capital of $3,750,000; and the implica-tion is that practically this was a new and different corpora-tion. Of course, legally speaking, a corporation does not change its identity by adding a cubit to its stature. The nominal capital of the corporation was the same when the contract was made and after the public had subscribed. Therefore what must be meant is, as we have said, that the corporation got a new right from the fact that new men who did not know what it had done had put in their money and had become members. It is assumed in argument that the new members had no ground for a suit in their own names, but it is assumed also that their position changed that of the corporation, and thus that the indirect effect of their acts was greater than the direct; that facts that gave them no claim gave one to the corporation because of them, notwithstanding its assent. We shall not consider whether the new members had a personal claim of any kind, and therefore we deal with the case without prejudice to that question, and without tak-ing advantage of what we understand the petitioner to concede.

But, if we are to leave technical law on one side and ap-proach the case from what is supposed to be a business point of view, there are new matters to be taken into account. If the corporation recovers, all the stockholders, guilty as well as innocent, get the benefit. It is answered that the corporation is not precluded from recovering for a fraud upon it, because the party committing the fraud is a stockholder. *Old Domin-ion Copper Mining and Smelting Co.* v. *Bigelow*, 188 Massa-chusetts, 315, 327. If there had been innocent members at the time of the sale, the fact that there were also guilty ones would not prevent a recovery, and even might not be a suffi-

cient reason for requiring all the guilty members to be joined as defendants in order to avoid a manifest injustice. *Stockton* v. *Anderson,* 40 N. J. Eq. 486. The same principle is thought to apply when innocent members are brought in later under a scheme. But it is obvious that this answer falls back upon the technical diversity between the corporation and its members, which the business point of view is supposed to transcend, as it must, in order to avoid the objection that the corporation has assented to the sale with full notice of the facts. It is mainly on this diversity that the answer to the objection of injustice is based in *New Sombrero Phosphate Co.* v. *Erlanger,* 5 Ch. D. 73, 114, 122.

Let us look at the business aspect alone. The syndicate was a party to the scheme to make a profit out of the corporation. Whether or not there was a subordinate fraud committed by Bigelow and Lewisohn on the agreement with them, as the petitioner believes, is immaterial to the corporation. The issue of the stock was apparent, we presume, on the books, so that it is difficult to suppose that at least some members of the syndicate, representing an adverse interest, did not know what was done. But all the members were engaged in the plan of buying for less and selling to the corporation for more, and were subject to whatever equity the corporation has against Bigelow and the estate of Lewisohn. There was some argument to the contrary, but this seems to us the fair meaning of the bill. Bigelow and Lewisohn, it is true, divided the stock received for the real estate now in question. But that was a matter between them and the syndicate. The real estate was bought from Keyser by the syndicate, along with his stock in the Baltimore company, and was sold by the syndicate to the petitioner along with the Baltimore company's property, as part of the scheme. The syndicate was paid for it, whoever received the stock. And this means that two-fifteenths of the stock of the corporation, the 20,000 shares sold to the public, are to be allowed to use the name of the corporation to assert rights against Lewisohn's estate that

will enure to the benefit of thirteen-fifteenths of the stock that are totally without claim. It seems to us that the practical objection is as strong as that arising if we adhere to the law.

Let us take the business point of view for a moment longer. To the lay mind it would make little or no difference whether the 20,000 shares sold to the public were sold on an original subscription to the articles of incorporation or were issued under the scheme to some of the syndicate and sold by them. Yet it is admitted, in accordance with the decisions, that in the latter case the innocent purchasers would have no claim against any one. If we are to seek what is called substantial justice in disregard of even peremptory rules of law, it would seem desirable to get a rule that would cover both of the almost equally possible cases of what is deemed a wrong. It might be said that if the stock really was taken as a preliminary to selling to the public, the subscribers would show a certain confidence in the enterprise and give at least that security for good faith. But the syndicate believed in the enterprise, notwithstanding all the profits that they made it pay. They preferred to take stock at par rather than cash. Moreover, it would have been possible to issue the whole stock in payment for the property purchased, with an understanding as to 20,000 shares.

Of course, it is competent for legislators, but not, we think, for judges, except by a *quasi*-legislative declaration, to establish that a corporation shall not be bound by its assent in a transaction of this kind, when the parties contemplate an invitation to the public to come in and join as original subscribers for any portion of the shares. It may be said that the corporation cannot be bound until the contemplated adverse interest is represented, or it may be said that promoters cannot strip themselves of the character of trustees until that moment. But it seems to us a strictly legislative determination. It is difficult, without inventing new and qualifying established doctrines, to go behind the fact that the corporation remains one and the same after once it really exists.

When, as here, after it really exists, it consents, we at least shall require stronger equities than are shown by this bill to allow it to renew its claim at a later date because its internal constitution has changed.

To sum up: In our opinion, on the one hand, the plaintiff cannot recover without departing from the fundamental conception embodied in the law that created it; the conception that a corporation remains unchanged and unaffected in its identity by changes in its members. *Donnell* v. *Herring-Hall-Marvin Safe Co.*, 208 U. S. 267, 273; *Salomon* v. *Salomon & Co.* [1897], A. C. 22, 30. On the other hand, if we should undertake to look through fiction to facts, it appears to us that substantial justice would not be accomplished, but rather a great injustice done, if the corporation were allowed to disregard its previous assent in order to charge a single member with the whole results of a transaction to which thirteen-fifteenths of its stock were parties, for the benefit of the guilty, if there was guilt in any one, and the innocent alike. We decide only what is necessary. We express no opinion as to whether the defendant properly is called a promoter, or whether the plaintiff has not been guilty of laches, or whether a remedy can be had for a part of a single transaction in the form in which it is sought, or whether there was any personal claim on the part of the innocent subscribers, or as to any other question than that which we have discussed.

The English case chiefly relied upon, *Erlanger* v. *New Sombrero Phosphate Co.*, 3 App. Cas. 1218, affirming *S. C.*, 5 Ch. D. 73, seems to us far from establishing a different doctrine for that jurisdiction. There, to be sure, a syndicate had made an agreement to sell, at a profit, to a company to be got up by the sellers. But the company, at the first stage, was made up mainly of outsiders, some of them instruments of the sellers, but innocent instruments, and, according to Lord Cairns, the contract was provisional on the shares being taken and the company formed (p. 1239). There never was a moment when the company had assented with knowledge of the facts.

The shares, with perhaps one exception, all were taken by subscribers ignorant of the facts, 5 Ch. D. 113, and the contract seems to have reached forward to the moment when they subscribed. As it is put in 2 Morawetz, Corp. (2d ed.) § 292, there was really no company till the shares were issued. Here thirteen-fifteenths of the stock had been taken by the syndicate, the corporation was in full life and had assented to the sale with knowledge of the facts before an outsider joined. There most of the syndicate were strangers to the corporation, yet all were joined as defendants (p. 1222). Here the members of the syndicate, although members of the corporation, are not joined, and it is sought to throw the burden of their act upon a single one. *Gluckstein* v. *Barnes* [1900], A. C. 240, certainly is no stronger for the plaintiff, and in *Yeiser* v. *United States Board & Paper Co.*, 107 Fed. Rep. 340, another case that was relied upon, the transaction equally was carried through after innocent subscribers had paid for stock.

*Decree affirmed.*