### OLD DOMINION COPPER MINING & SMELTING CO. v. LEWISOHN et al.

#### (Circuit Court, S. D. New York.  December 1, 1911.)

CORPORATIONS (§ 316*)—TRANSACTIONS WITH DIRECTORS—VALIDITY.

 A corporation has no right of action against directors who sold to it all the outstanding stock of another company at an undisclosed profit, though a popular stock subscription was contemplated, and though associates of the directors did not know of an additional profit obtained by the managers of their syndicate.

 [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1401–1415; Dec. Dig. § 316.*

 Acquisition by corporation of stock of other corporation, see note to Anglo-American Land Mortgage & Agency Co. v. Lombard, 68 C. C. A. 120.]

In Equity.  Bill by the Old Dominion Copper Mining & Smelting Company against Frederick Lewisohn and others.  Bill dismissed.

See, also, 179 Fed. 1023.

Mr. Brandeis and Mr. McClennen, for complainant.

Mr. Treadwell, for defendants.

HOUGH, District Judge.  The necessary method of reaching judgment in this litigation is unusual.  In most equity cases the facts are first ascertained and stated; and to those facts what seems appropriate law is applied, after consideration of prior decisions, wherein similarity is not always apparent and identity never exists.  In this case, however, the first duty is to ascertain what there is left to decide, having regard to the history of several allied suits; a history writ very large in the reports, and not calculated to encourage any one who hopes to look upon the law as a science.

It has always been admitted that two men, Bigelow of Massachusetts and Lewisohn of New York, formed a plan not later that the early part of 1895 to acquire certain mining properties, to associate with themselves others who would furnish as much as possible of the necessary money, both for purchase and reorganization, and after acquisition, either to form a new corporation or reorganize an old one in such manner that to them as the devisers—if not technically the promoters of the plan—a considerable portion of the stock of the newly formed or reorganized company would flow, and, further, to do all this while maintaining the market value of the securities of the enterprise at a price that would enable them as stock owners to dispose of their own holdings (if desired) at a handsome profit.  It is not denied that this result was either wholly or partially accomplished, and that

some seven years after the formation of a new corporation (this complainant) for the purposes aforesaid, the control of that company passed out of the hands of Bigelow and Lewisohn and their more intimate associates, whereupon those who succeeded them in its management found, or assert they found, not only that too high a price had been paid for the property originally, but that the profit secured by Bigelow and Lewisohn especially was, in the judgment of their successors in corporate control, illegitimate and illegal.

Such illegality it was alleged attached to two distinct and separate transactions, viz.: (1) The purchase of the corporate property of a certain Maryland corporation which at the time of the formation of the plan aforesaid owned the mining properties which Bigelow and Lewisohn desired to exploit; and (2) the acquisition of mining claims and real estate situate apparently near the properties of the Maryland corporation and owned of record by one of the large shareholders in that company, but for the company's benefit.

It was apparently impossible to obtain service upon Bigelow in New York or Lewisohn in Massachusetts, so that for reasons immaterial to the present trial (but curiously productive of the labyrinth of decisions through which it is necessary to thread one's way) it was decided to begin four actions, viz., two against Bigelow in Massachusetts and two against Lewisohn (or his executors) in New York. One suit against each defendant claimed relief in respect of the acquisition of the corporate property of the Maryland corporation, and the other suit against each similarly claimed in respect of the purchase of the real estate and mining claims aforesaid.

Thus in or about 1902 there were four bills in equity promoted, each of them stating in exactly the same language the facts upon which legal relief was demanded, the only difference between the four bills being in the prayers for relief and the names of the defendants.

The seeds of confusion having been thus sown, a decision (on demurrer) was first rendered in this court, and upon one bill—in February, 1905—the facts of the case as derived from the pleader's allegations are sufficiently stated in 136 Fed. 915.

A few months later a decision upon a similar demurrer to an identical bill (except that Bigelow was defendant instead of Lewisohn) was announced in 188 Mass. 315, 74 N. E. 653, 108 Am. St. Rep. 479. Loring, J., gave to the language of the bill the same meaning as did Lacombe, J., but declared the law to be wholly different, not only by reason of precedents binding in Massachusetts, but because the previous decisions cited had been misunderstood by Judge Lacombe. 188 Mass. 324 et seq., 74 N. E. 653, 108 Am. St. Rep. 479.

Thereupon the Massachusetts cases stood for trial, but the defeated complainant in New York amended his bill, and, it being again demurred to, brought the demurrer on before Holt, J., in November, 1905. It was then held (without reported opinion) that the amendments had not changed the substance of complainant's case, and the demurrer was again sustained. From this decision complainant appealed, and in 148 Fed. 1020, 79 C. C. A. 534, the Circuit Court of Appeals for this circuit considered the matter in the light of the views

expressed by Justice Loring, and Wallace, J. (notwithstanding the intimation from Massachusetts that previous decisions had been misunderstood in the lower court) felt "constrained to adhere to the prior adjudication of this circuit."

Thereupon the matter was taken to the Supreme Court of the United States, where, without putting any new interpretation upon the language of the bill, the decision below was affirmed. 210 U. S. 206, 28 Sup. Ct. 634, 52 L. Ed. 1025.

This disposed of one only of the New York suits, and the present action, which is to recover in respect of the acquisition by complainant of the corporate property of the Maryland Company, has awaited trial for years. It does not seem to have been pressed while the Massachusetts suits were pursued to their ultimate. Of them a trial was had before Sheldon, J., who decreed for the complainant company and against Bigelow, making findings of fact which were adopted nearly if not quite in toto by the Supreme Court of the state, and from them drawing conclusions of law which were approved of by a majority of that court. 203 Mass. 159, 89 N. E. 193. The closeness of the decision is indicated by the fact that a majority was only produced by Justice Sheldon's voting to affirm his own decree.

The opinion of Rugg, J., in 203 Mass., 89 N. E., was written after the Supreme Court of the United States had spoken, and is a most interesting and exhaustive statement of two leading propositions, viz.: (1) That the United States Supreme Court was wrong (203 Mass. page 196, 89 N. E. 209), and therefore, "with great respect to" its decision, the earlier cases in Massachusetts should be adhered to. (2) That if not merely a pleading, but the facts shown by the evidence before Sheldon, J., had been before the national courts, they might have adhered to their erroneous law and yet reached the same conclusion as did a majority of the Massachusetts tribunal.

This solution of difficulties had been first suggested (so far as the reports show) by Pitney, C., in 74 N. J. Eq. 511, 71 Atl. 153. Bigelow having been defeated before Sheldon, J., sought to enjoin complainant (a New Jersey corporation) from further pursuing him. The chancellor, in denying his right thus to outflank the courts of Massachusetts, made the suggestion referred to. The statement is obiter, whatever may be thought of its accuracy.

The only apparent result of Bigelow's experiment in New Jersey was that the Massachusetts court enjoined him from further similar efforts. 203 Mass. 163, 89 N. E. 193.

Justice Rugg's expansion of the chancellor's suggestion is this: (1) The bill did not reveal the fact that the sale of the Maryland Company's property to complainant was not "consummated" by delivery of deeds until December, 1895, or even later, and before that time there were undoubtedly many other shareholders in complainant besides Bigelow and Lewisohn, their attorneys, employés, and "dummies." 203 Mass. 196–198, 89 N. E. 193. (2) The bill did not show that prior to the formation of complainant Bigelow and Lewisohn held out to their syndicate subscribers promises of intention to form a new corporation of no more than $2,500,000 capital, wherein they would

be shareholders. From this it follows that the actual organization of a company with $3,750,000 capital and absorption of the excess stock by Bigelow and Lewisohn themselves was a wrong to the corporation itself, because the syndicate members who were entitled to become shareholders should be treated as shareholders and "entitled to all their rights." 203 Mass. 200, 89 N. E. 211. Such rights existed on and before July 11, 1895, the date alleged in the bills as the date of purchase.

Years after its filing the bill in this suit was by leave of court amended, so as to avoid stating (totidem verbis at all events) what was distinctly averred in the bill before the Supreme Court of the United States, viz., that on or about July 12, 1895, complainant entered into possession of the property of the Maryland Company (cf., section 16 of bill before S. C. U. S., with sections 16 and 17 of present bill), and that it was on or about July 18, 1895, that Bigelow and Lewisohn caused complainant to offer its stock to the public (cf., section 15 in both bills). By amendment, also, appropriate allegations were inserted setting forth defendants' original promise to the public of forming a corporation with a capital of two and a half millions only, and their violation thereof, to their own benefit and advantage (section 3, present bill).

Having made these changes in pleading, complainant adduced what were asserted at bar to be the same depositions considered by Sheldon, J., and brought on the cause for hearing.

It is, I think, obvious from the foregoing summary that no more is left for decision by a trial court of the United States than this, viz.: Do the two propositions above stated, even if well founded in fact, give rise to the legal conclusions asserted, and are such legal conclusions inconsistent with the decision of Holmes, J., to which this court owes not only as "great respect" as do other tribunals, but also —what is much more important—absolute obedience?

Defendants deny that even this duty is laid upon me, and assert as the starting point of their argument that the judgments from 136 Fed. to 210 U. S., 28 Sup. Ct., 52 L. Ed., make this litigation res adjudicata, and adjudicated in their favor.

On this point it is not necessary to express an opinion, if decision can be otherwise reached, however interesting and important the legal query involved. Indeed, such a matter had much better be left to the appellate court, for which this hearing is but a rather unimportant preparation.

If now the facts be considered, that is found which so often—if not more often than otherwise—characterizes records of great size and litigations prolonged beyond patience. There is no dispute over the facts, in so far as facts mean that certain acts were done and documents written on certain days and in certain places. It is not, of course, admitted by defendants that the syndicators whose money purchased, and the subscribers whose money fortified, the property of complainant, were quite as innocent of matters of common knowledge as some of them would have the court believe, but the contest over facts narrows to questions of inference, intent, and mental atti-

tude. Accordingly, it may be assumed without discussion of evidence that the actual deeds from Maryland Company to complainant did not pass until the winter of 1895–96, and that before that time there were many shareholders in complainant who did not exist as such in the preceding July.

It may also be admitted that Bigelow and Lewisohn did say to the subscribers to their syndicate that the company in contemplation would be capitalized at $2,500,000, but there is no evidence that such a suggestion was in respect of any person an enforceable legal obligation.

The next inquiry is whether these findings of fact absolutely require the legal conclusions insisted on by complainant. For answer the opinion of Holmes, J., is to searched as the navigator does his chart, and if even any indications of the path are found they must be followed. This is especially true in a case of this sort, first, because a trial court always makes confusion by attempting to pare down or limit the broad outlines of a ruling decision in the same litigation, and, second, because the results of a decree for complainant presently given in this court would, unless overwhelmingly demanded by plain differences, merely serve (in all probability) to injure both parties by delaying authoritative final decision.

It may be well to point out some things not decided by the Supreme Court. It has never been said that no cause of action in favor of some one existed against defendants by reason of the matters alleged in all the bills. It has only been said that this complainant has received no legal harm by reason of anything hitherto shown.

What, then, has been shown to the federal courts before now?

The contract of purchase was made and the property delivered on July 11 and 12, 1895, when Bigelow, Lewisohn, and some other members of the syndicate held all the outstanding (not all the authorized) stock. 210 U. S. 212, 28 Sup. Ct. 634, 52 L. Ed. 1025. This is just as true as ever, but it is no longer "alleged in terms that the sales were consummated" before July 18. Id. Here is the only new matter, and on this peg hangs the whole demand.

On July 12th and long before September 18th, Bigelow and Lewisohn had paid for the stock of the Maryland Company with the money of themselves and associates; they owned it all; within the same times they were also the only shareholders in complainant; they actually transferred possession of what they owned in one right to a company which they similarly owned in another; they did so by perfectly familiar legal methods, which would have made it a plain fraud in the Maryland Company to refuse written conveyance, and gave to that corporation an enforceable claim against complainant, for which one remedy certainly was injunctive relief against parting with the agreed amount of stock to any one else. The absence of bills of sale and indentures was a mere cloud on title, and no more.

The final inquiry for me is this: When the ruling decision declares that the "sales were consummated before July 18th" (210 U. S. 212, 28 Sup. Ct. 636, 52 L. Ed. 1025), does it mean that the substance of

the transaction had been accomplished and possession been given, or that every detail of the business had been ended?

It seems to me that the statement of the question is its own answer, and I certainly leave it to higher courts to nullify a thrice argued ruling on so small a difference.

The second proposition, viz., that the syndicators are entitled to shareholders' rights, and since those rights existed when sale made (July 11th), that their ignorance of defendants' illegitimate profits confers right of suit on the corporation, seems to me entirely disposed of by Holmes, J.:

"The syndicate was a party to the scheme to make a profit out of the corporation. Whether or not there was a subordinate fraud committed by Bigelow and Lewisohn on the agreement with them, as the petitioner believes, *is immaterial to the corporation.*" 210 U. S. 214, 28 Sup. Ct. 637, 52 L. Ed. 1025.

It is the very essence of complainant's contention here that defendants sold complainant for $2,000,000 in stock what was worth and had cost them not over half as much.

But every syndicate member was a party to that fraud, if it was one. The bill before the Supreme Court plainly averred that defendants had sinned by getting more than the "two for one," which was the very object of the syndicate and syndicators, and the result was the remark last above quoted.

Now it is asserted that the same acts give the same relief as previously demanded and denied, because, before formation of complainant, defendants led their fellow conspirators to believe that they would refrain from any rate of gain not common to all.

The distinction is without difference, and the new allegations and evidence immaterial.

There are many defenses to which no reference is made. Silence does not mean that they are unworthy of discussion. It is wished to confine this memorandum to a consideration of new points only, in the light of the decision beyond which this court cannot go.

If there be error here, it is in grasping the central thought of the reasoning. I think it is found on page 213 of 210 U. S., on page 636 of 28 Sup. Ct. (52 L. Ed. 1025):

"The nominal capital of the corporation was the same when the contract was made and after the public had subscribed. Therefore what must be meant (by argument for complainant) is that the corporation got a new right from the fact that new men who did not know what it had done had put in their money and had become members."

This is exactly the argument always advanced, successfully in other courts, and now pressed so far at bar as to elicit an admission that the corporate complainant could sue as largely as it has done if one single man became a small shareholder before "consummation" of the iniquity against which the corporation seeks relief.

Whether this be absurd or not, the general doctrine was repudiated by the Supreme Court, and without indulging in unwarranted refinements of construction, no other result can here be reached but to dismiss the bill, and it is so ordered.