## RECOVERY OF PROFITS IMPROPERLY OBTAINED BY DIRECTORS AND LARGE STOCKHOLDERS.

Superior Court of Cincinnati.

HERMAN W. SANTEN, FOR HIMSELF AS A STOCKHOLDER, FOR ALL OTHER STOCKHOLDERS OF THE UNITED STATES SHOE COMPANY, AND FOR THE UNITED STATES SHOE COMPANY, AN OHIO CORPORATION v. THE UNITED STATES SHOE COMPANY, THE HOLTERS COMPANY, THE KROHN-FECHHEIMER COMPANY, THE VAL DUTTENHOFER SONS COMPANY, THE ROBERT WISE COMPANY, THE SCHEIFFELE SHOE MANUFACTURING COMPANY, and THE LEWIS S. ROSENSTEIL COMPANY, all Ohio Corporations; JOHN G. HOLTERS, ROBERT WISE, WILLIAM H. SCHEIFFELE, JOHN DUTTENHOFER, MARCUS FECHHEIMER and W. E. HUTTON & COMPANY, a Partnership.*

Decided February, 1925.

*Corporations—Action by a Stockholder to set aside an Improper Transaction—Payment Compelled into the Treasury of the Corporation of a Large Sum Wrongfully Withheld.*

1. No demand upon the corporation or its directors to bring an action to recover profits, alleged to have been improperly obtained by certain of its directors and large stockholders, is necessary prior to the commencement of such an action by a stockholder, where the petition alleges and the facts indicate that such demand would be futile or that such action, if brought, would be under the control of the persons adversely affected thereby.

2. Where the purchaser of stock, "when as and if issued," borrows money to make such purchase, and interim certificates therefor are taken in the name of the lender to secure the loan, and the loan is paid off and the stock issued in the name of the original purchaser, such purchaser is the real party in interest and entitled to enforce all of the rights adhering to such stock from the date of his original purchase.

3. The purchaser of stock from a syndicate member offering such stock to the public "when as and if issued" prior to the issue of such stock by the corporation to the syndicate, upon the issue thereof acquires the rights of a stockholder from the date of his purchase, and is not estopped from attacking wrongs consummated thereafter by the knowledge of and acquiescence and participation in such wrongs by the syndicate member from whom said stockholder bought and who was his immediate transferor. (*Old*

---

* No appeal or error was taken from the findings in this case.

*Dominion case*, 210 U. S., 206, distinguished; *Davis* v. *Las Ovas Company, Incorporated*, 227 U. S., 80, followed.)

4. *Quaere*: Whether it is necessary that a complaining stockholder own his stock at the time of the wrongs complained of? The New York Rule that a stockholder may bring an action to set aside an improper transaction completed before he acquired his stock, preferred to the contrary federal equity rule. (*Pollitz* v. *Gould*, 202 N. Y., 11, approved.)

5. Thirty thousand dollars fixed as a reasonable fee for plaintiff's attorneys in an action by a stockholder resulting in restitution to the corporation by settlement of approximately $400,000 in cash and the return for cancellation of no par value stock issued as equivalent to $232,000.

*Dolle, Taylor, O'Donnell, Geisler & Ellis* and *Albert D. Cash* and *Herman W. Santen*, for plaintiff.

*Ernst, Cassatt & Cottle*, for W. E. Hutton and U. S. Shoe Company.

*Ritchie, Herman & Ritchie*, for Holters Co., John Holters, Scheiffele Shoe Co., and W. H. Scheiffele, U. S. Shoe Co., Robert Wise Co., and Krohn-Fechheimer Co.

*Stricker & Johnson* and *Edgar S. Johnson*, for Lewis S. Rosensteil Company.

*Moulinier, Bettman & Hunt*, for Robert Wise.

*Alfred B. Benedict* and *Frank H. Kunkel*, for The Val Dut tenhofer Sons Co. and John Duttenhofer.

*Murray Seasongood*, for Marcus Fechheimer.

The plaintiff brought the above action against the U. S. Shoe Company, a corporation formed by the merger of five other shoe companies. He included as defendants the original directors and promoters of said company, the companies participating in said merger, and the vendors who sold the underlying companies to the new corporation.

The plaintiff brought his action as a stockholder on behalf of the new corporation and of all other stockholders, and alleged that the defendants had joined together for the purpose of selling and had sold the U. S. Shoe Company the stock and assets of the five other shoe companies at a knowingly inflated valuation and had caused said company to pay for such stock and assets by transferring to the defendant vendors preferred and common stock of the U. S. Shoe Company amounting to $2,819,860, at its par and issue price, and also $2,152,427 in cash, derived from the sale of additional

preferred and common stock of said company, making a total consideration in cash and stock of $4,972,287.

The plaintiff sought a recission of the transactions complained of and prayed in the alternative for an accounting and a decree requiring the defendants to restore to The U. S. Shoe Company all profits, commissions, money and stock, unlawfully or inequitably obtained.

The action was commenced without making a demand upon the U. S. Shoe Company or its directors to bring such action, and the petition alleged that such demand would be futile since a majority of the directors were either defendants or participants in the wrongs complained of.

Upon the trial, it appeared that the plaintiff purchased "ten units" of stock, "when as and if issued," from W. E. Hutton & Company on March 22, 1923, and paid eighteen hundred and seventy dollars for same, on March 29, 1923. A "unit" consisted of one share of preferred stock and four and a half shares of no par value common stock. The price per unit was one hundred and eighty-seven dollars. The stock was offered for public subscription by the defendant, Hutton, as a broker and as manager of a selling syndicate about March 20, 1923. At this time, the defendant Hutton knew all of the facts in connection with the proposed merger which he had informally agreed to underwrite, and had formed banking and selling syndicates for the purpose of marketing the stock sold to the public. No formal offer to purchase stock from the U. S. Shoe Company was made until March 29, 1923, on which date Hutton offered to buy and the corporation agreed to sell to Hutton, preferred and common stock for a consideration in excess of two million dollars. This stock was subsequently issued to Hutton on or after April 16, 1923. Meanwhile "interim unit certificates" were issued to those who had previously subscribed for stock, certifying that the holder was entitled to receive the number of shares subscribed for, "when, as, and if issued."

It appeared that the plaintiff had borrowed all of the money to purchase the units subscribed for by him from Mr. Herbert H. Hoffman and, at the direction of the plaintiff, an "interim unit certificate" was issued to and in the name of Hoffman who held the same in his possession as security for the plaintiff's debt to him. However the original purchase

was made by Santen and the receipt of payment was issued to and in the name of Santen by Hutton, on March 29, 1923.

Subsequently, the plaintiff paid his debt to Hoffman partly in cash and partly by the deposit of other collateral. The "unit certificate" was then presented for transfer into the name of the plaintiff who surrendered the same for certificates of stock which were issued in his name.

Prior to commencing this suit, the plaintiff sold all of his preferred stock and, at the time of the trial, owned forty-five (45) shares of no par value common stock which stood in his name upon the books of the company and of which he possessed the certificates.

Upon these facts appearing, the defendants objected to a continuation of the trial on the ground that the plaintiff was without any right to maintain his action. In support of this objection, the defendants urged:

*First.* That he had made no demand upon the corporation.

*Second.* That the plaintiff, Santen, was not a stockholder at the time of the wrongs complained of, and that the legal title and beneficial interest of the stock, subsequently acquired by him, was then in the name of and possessed by Mr. Herbert H. Hoffman; and

*Third.* That since the stock upon which the plaintiff, Santen, bases his right to maintain this action, was purchased originally from the defendant Hutton and not from the U. S. Shoe Company, and Hutton was estopped to complain of the transactions attacked in the petition, the plaintiff has no greater rights than Hutton possessed.

MARX, J. (Orally.)

I have considered the several objections that have been made to the right of the plaintiff to continue this action. It is proper that these questions should be determined at the outset, and if it is clearly apparent at the very outset of the case that the plaintiff has no right to maintain his action, it should be so determined and the proceedings stopped.

First, as to the stock which the plaintiff owns, namely 45 shares of no par value common stock of the United States Shoe Company as evidenced by certificate No. 2100, dated January 14, 1924. In the opinion of the court, the evidence shows that the plaintiff is the real party in interest insofar

as the ten units of United States Shoe Company are concerned, evidenced by his receipt from W. E. Hutton & Co., dated March 22, 1923, for which he paid $1,870, and as the real party in interest, insofar as such units are concerned, is entitled to enforce whatever rights may inhere in the units purchased by him from the date of his purchase, namely, March 22, 1923.

It is conceded in the answers of practically all of the defendants that the plaintiff is a stockholder of the United States Shoe Company. So at this stage of the case there is no question that the plaintiff is at the present time a stockholder, and at this stage of the case there is sufficient. evidence to warrant the court in reaching the opinion that he is, and has been ever since March 22, 1923, the real party in interest insofar as his purchase on that date is concerned.

There is some claim made that because the interim certificate was taken for the purpose of security in the name of Mr. Hoffman, from whom plaintiff borrowed the money to purchase same, that Hoffman rather than Santen was the original stockholder. Mr. Hoffman is not making any such claim. So far as the evidence now appears, he merely held the certificate as security for the loan. The plaintiff upon repaying the money would be entitled to the certificate and to have it transferred upon the books. The situation in its legal sense is not materially different than if the stock had been originally taken by direction of the plaintiff in the plaintiff's own name and endorsed by him for the purpose of security to Hoffman. However, that may be, the query may be raised as to whether, even if Hoffman was originally the legal owner of the stock (Hoffman being innocent in so far as the evidence now shows, and the plaintiff holding directly from an innocent transferor) whether Santen would have a right to maintain this action. That question, under the Equity Rules, would be answered in the negative, but the equity rules of the United States courts are matters of practice in those courts. The Federal rule does not prevail in the great majority of states, and perhaps the clearest enunciation to the contrary is contained in *Pollitz* v. *Gould,* 202 N. Y., 11, of which the syllabus reads:

"A stockholder may, in the absence of special circumstances, maintain an action on behalf of the corporation for the

benefit of himself and all other stockholders, · to set aside an improper transaction consummated at the expense of the corporation, such as the exchange of capital stock for that of another corporation, although it was completed before he acquired his stock.''

The opinion is concurred in by the entire Court of Appeals of New York, and is addressed to that single question and considers the conflicting authorities and reaches the conclusion expressed in the syllabus for the reason that it is supported by the weight of authority outside of the Federal courts and accords with the better reasoning.

Having thus reached the conclusion that at this stage of the case there is sufficient evidence to warrant us in finding the plaintiff a stockholder entitled to enforce such rights as adhere in his purchase, the next question is; what are those rights?

It is suggested that there is no right in this case because there has been no demand made upon the board of directors of the United States Shoe Company. However, taking the petition by its four corners, it must be self-evident that it would be a vain thing to ask the board of directors of the company, as it was constituted at the time that this action was filed, to bring such an action as the plaintiff has brought in this case. It is contrary to reason to believe that they would do so. If that conclusion may be reached by reading the petition, the plaintiff must be afforded an opportunity to prove the allegations of his petition; therefore it would be premature to hold, before he has had an opportunity to offer any evidence, that he can not prove his allegation, and that it would not have been futile. Furthermore, there is other evidence here which would indicate that the corporation would not have acceded to any request to bring such a suit as this; the answer filed by the defendant (U. S. Shoe Co.); the fact that the defendant and its co-defendant, the W. E. Hutton Co. are represented by the same counsel, although their interests are, according to this stockholder's claim, in a degree adverse; the fact that the answer of the United States Shoe Company is joined with the answer of the Holters Company, the Krohn-Fechheimer Company and the Robert Wise Company; the fact that no such action has been brought in the considerable time that has intervened, all point to the ability of the

plaintiff to establish his claim that it would have been futile to have requested such an action.

It is next suggested that the plaintiff is without any right to maintain this action because his stock was purchased through one of the original members of the syndicate and that the syndicate participated and acquiesced in all of the acts complained of, and since the stockholder can rise no higher than his immediate transferor, and his immediate transferor is without rights, the stockholder is clearly estopped from complaining. There is no question about the fact that the decision of the Supreme Court of the United States in the *Old Dominion case*, 210 U. S., 206, is an authority which in many particulars tends to support this claim. It is also true that there are many facts in this case which, if proved, tend to take it without the rule approved by the Supreme Court of the United States. It should also be noted that the highest court in the state of Massachusetts in another branch of the same case, reached a directly opposite conclusion and that its finding that the stockholder could maintain an action and its judgment against one of the promoters was ultimately affirmed by the Supreme Court of the United States upon the federal point involved.

It has been stated that there is no controlling authority in Ohio, so that this court would be free to follow either the rule announced by the highest court of Massachusetts or the rule announced by the highest court of the United States, if the facts in this case ultimately come within the confines of that decision. However, there are apparent at the outset some facts which tend to distinguish the present case from the *Old Dominion case*. In the *Old Dominion case* the money of the innocent subscribers, the public, was subscribed and paid after the stock had been issued to the parties concerned in the alleged wrongs. In the present case it would appear at this stage that the money of the public was actually subscribed and paid prior to the consummation of the wrongs complained of. For example, it appears at this preliminary stage that the plaintiff paid $1,870 for ten units of stock in the United States Shoe Co., on March 29, 1923, and that was a considerable period prior to the time when the stock was issued. It would also appear that all of the parties, including the so-called vendors, promoters and the so-called

syndicate, understood that the stock for which the plaintiff paid, was a part of the stock to the extent of something in excess of two million dollars that was to be sold to the public in order to derive the very money with which to purchase the properties of the so-called vendors. In other words, the money that was to be used to complete these proposals was first to be obtained from the public within the contemplation of the parties and was in fact obtained from the public before the transactions were completed. Now that appears in the letter of the president of the United States Shoe Company, dated March 17, 1923, in which he says that: "of the total amount of preferred and common stock outstanding, nearly one half of the preferred and nearly two-thirds of the common have been taken by the stockholders and officers of the old companies *at the present offering price to the public.*" That letter was written before any purchase had been completed or before any stock had been issued.

The circular signed by W. E. Hutton & Co. is headed. "The United States Shoe Co. to be offered for *public* subscription." That circular was issued and subscriptions were received before either the properties of the defendant vendors had been bought or before the stock had been issued. Again in the original option contracts in a number of places, in which the contemplated corporation and the *modus operandi* by which it is to be consummated is set up and described; and which is dated March 12, 1923, the fact that stock is to be sold to the public is frequently referred to. For example, Exhibit A, Schedule 11, which described the so-called set-up of the United States Shoe Manufacturing Co., says: "To be issued to the vendors in part payment for plants and properties to be acquired, 9,698 shares preferred, 92,503 shares no par value common" and then underlined in the original, "*To be sold to public for cash,* 11,802 shares preferred, 53,997 shares no par value common." There are other references in this exhibit which tend to prove that all of the parties intended to derive the money with which to complete the purchase price of the five vendor companies, from a public purchase of securities of the company to be sold by a syndicate, and that they in fact sold these securities and in fact secured the money before they made the purchase or issued the securities, and in that respect the case is totally

different from the *Old Dominion case* where the public's money came in *after* and not before. This case is more nearly like that of *Davis* v. *Las Ovas Co., Inc.,* in 227 U. S., page 80. In that case the opinion is by Judge Lurton, one of the ablest judges of our own Court of Appeals and later of the Supreme Court of the United States and incidentally approves the opinion of his former colleague, Judge Severens, also a most able jurist, in *Yeiser* v. *U. S. Paper Co.,* 107 Fed. Rep., 340. The Supreme Court of the United States is unanimous in that case; it is a later decision than the *Old Dominion case* and some of the language so clearly answers the arguments that were made by counsel here yesterday that I may be pardoned if I read part of it. They distinguish the *Old Dominion case* by saying that there the entire transaction was between the members of the syndicate and there could be no innocent parties, but here, prior to the consummation there were either innocent incorporators or stockholders and "some of those, if not all, interested by appellants in the property and in the purchase for a proposed consideration were ignorant of the real price which they were to pay for it, and were not, therefore, in complicity with their scheme to make a secret profit. These innocent members of the syndicate became stock subscribers and directors of the company, as did appellants. The buyers and sellers were not the same." "Those of the syndicate assuming to act for the corporation in acquiring the property were under obligation to disclose the truth and deal openly. In the absence of such disclosure the corporate assent was obtained on false grounds. The wrong was done when those members of the syndicate not in complicity with appellants subscribed to the stock of the company and aided their guilty associate managers in the corporate action necessary to the corporate acquisition of the property at the exaggerated price placed upon it by those who were to realize a secret profit. Thus, the original fraud practiced upon some of those associated with them in the promoters' arrangement became operative against the corporation itself. The standing of the corporation"—that is its standing in court—"results from the fact that there were innocent and deceived members of the corporation when the property was taken over by it." And here there were cer-

tainly in equity innocent stockholders to the extent of over a million dollars' worth of stock who had paid their money before these properties were taken over by the United States Shoe Company.

"Neither is the corporate right of action defeated by the fact that the recovery will inure to the guilty"—this is the Supreme Court's answer to defendant's argument—"as well as to the innocent, nor is the fact that all of the parties who may have shared in the secret profits are not sued fatal to the case." This is the answer of the Supreme Court of the United States to the defendant's plea in abatement. "The corporation may well sue either one or all of those who received secret profits. There is no want of necessary parties because all are not here sued. The distinction between a case in which all of the owners of the property and all of the members of the buying corporation are the same persons and participate in the profits realized, and the case here presented is fully recognized in *Old Dominion Copper Co.*," etc. "There was no error in cancelling the shares issued to the plaintiffs in error for promotion of the corporation. They and the other members of the syndicate received these shares upon the assumption that they had in good faith served the corporation in the procurement of the property. Obviously appellants were serving themselves to the detriment of the corporation and innocent subscribers to its stock. In such a situation the corporation may recover the shares."

It hardly seems to me that any other authority is necessary but I must admit for the benefit of whatever course later arguments may take, that I am considerably impressed with the reasoning of Justice Rugg in deciding the *Old Dominion case* in Massachusetts, and particularly with the distinction that he draws between a case where the members of the syndicate and the sellers intend to remain the sole owners of the stock which they take from the company, and where they deliberately intend from the very outset to sell that particular stock to the public without any disclosure. He says for example: "In this respect the question is one of intention of the promoters. If they actually intend at the time the company is brought out to remain its sole owners, and that it shall not receive the money of innocent sharehold-

ers in the future, then, although thereafter the exigencies of the company may be such as to require the issue of additional stock, they may not be responsible." And in distinguishing *In re British Seamless Paper Box case,* 17 Ch. D., 467, he says: "If shortly after this transaction a prospectus had been issued, and the public had been invited to come in and take shares, no court would have listened to directors who said that it was not intended to take in fresh members; but this was commenced and carried on entirely as a private company," etc. And then he concludes: "This review of decisions seems to establish abundantly the proposition that promoters stand in a fiduciary position toward the corporation, as well when, as a part of the scheme of promotion, uninformed stockholders are expected to come in after the wrong has been perpetrated, as when at that time there are shareholders to whom no disclosure is made.

I will not read at greater length although there is a great deal of authority, particularly a case in the House of Lords of Englands *Erlanger* v. *New Sombrero Phosphate Co.,* 3 App. Cas., 1218, s. c. 5 Ch. D., 73-102, that strongly supports those views. Therefore, at this preliminary stage I will hold that the plaintiff may proceed with his effort to establish his case which is all that I am expected to hold at this time. I am not holding that he has established his right; I am not holding that he has proved in any particular anything that he alleges. I am holding that he has so far introduced sufficient evidence to warrant the court in allowing him to proceed.

NOTE.—After the above opinion and during the progress of the trial, an agreement of settlement was reached and presented in open court. In approving this settlement, the court said:

MARX, J. This settlement speaks for itself. No extended comment seems necessary.

The settlement is approved by the court as the best practicable solution of the present situation. It represents the agreement of all parties and all interests. The alternative is the continuance of protracted litigation with possibly disastrous consequences not only to parties but to innocent inter-

ests affected thereby. Happily, this result is avoided. Much as a peaceful end to this litigation is desired, I could not in good conscience approve of a compromise which resulted in any injustice to the rights of innocent investors necessarily involved in the representative and trust character of this action. This settlement is not subject to that objection.

By its terms, the promoters, vendors and directors make restitution to the U. S. Shoe Company of about four hundred thousand ($400,000) dollars in cash and equivalent, which is approximately twenty (20%) per cent. of the cash received from the public sale of stock in this company and they also return for cancellation, common stock which was issued at a price of about two hundred and thirty-two thousand ($232,000) dollars, being all of the so-called commission shares and pay thirty thousand ($30,000) dollars as plaintiff's attorney fees and the court costs.

In addition, the settlement of all litigation and the assurance of peace to the U. S. Shoe Company is of material value in increasing the efficiency and morale of its management, production and sales.

As a whole, this settlement should prove beneficial to the U. S. Shoe Company, its stockholders and employees and indirectly to the shoe industry and business-life of Cincinnati.

The court has fixed the fees of counsel for plaintiff at a figure commensurate with the size of the fund their diligence and professional skill have brought into court and, since this fee is paid by the vendors, promoters and directors, its payment does not impair the fund received by the U. S. Shoe Company.

In conclusion, the court wishes to thank counsel who have co-operated in arriving at this constructive compromise. Although it may have been to the personal profit of the lawyers to keep this litigation going, the settlement affected is a fresh demonstration that the leaders of our Bar are motivated by a desire for professional service rather than mere selfish gain. This co-operation has also resulted in the prompt trial and final disposition of a complicated case which ordinarily takes years to determine—in less than one year from its filing and in less than two months from the commencement of this trial.