STATE OF MARYLAND, to Use of GORALSKI et al., v. GENERAL STEVEDORING CO. et al.

(District Court, D. Maryland. January 26, 1914.)

Nos. 61, 65, 66, 68, 71, 85, 88, 89, 96, 106–108, 110, 113, 115, 116, 119, 121.

1. MASTER AND SERVANT (§ 315*) — INDEPENDENT CONTRACTOR — ACCIDENTAL EXPLOSION.

A steamship line, as chartered owner of a steamship, contracted to transport a cargo of coal and dynamite from Baltimore to the Isthmus of Panama. It directed the Foard Company, a corporation of Baltimore, to see that the dynamite was loaded and stowed and agreed to pay a stated sum per ton and other fees and commissions. The Foard Company em-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ployed the General Stevedoring Company to do the work. A foreman employed by the Stevedoring Company, superintending the stowage of dynamite in the hold, in attempting to force a case into place, negligently struck it with a bale hook, causing a small explosion, which, as shown by the weight of the testimony, set fire to the packing inside the box. The fire spread, and a few minutes later caused the explosion of the dynamite which had been stowed, wrecking the ship and causing the death of 30 persons, the injury of others, and a great loss of property. The Foard Company had previously by itself or through the Stevedoring Company loaded many vessels for the steamship line, including cargoes of dynamite, and had a high reputation in the city for capacity and efficiency. The stevedoring company on such findings of fact did not deny its liability for the damages caused by the negligence of its employé. *Held*, that the steamship line, having employed an independent contractor which it had reasonable ground to believe competent, was not liable for such damages.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1241, 1244–1253, 1255, 1256; Dec. Dig. § 315.*]

2. MASTER AND SERVANT (§ 301*)—INJURIES FROM ACCIDENTAL EXPLOSION—LIABILITY.

The Foard Company organized the General Stevedoring Company to take over the stevedoring work which had previously been a branch of its own business. It owned all of the stock, and the officers of both companies were the same. Such officers made contracts for both companies. The Foard Company kept all of the accounts of the stevedoring company in its own books, collected its accounts, placing the money in its own bank account, paid all of its bills, and every six months charged it for services exactly the amount of its net earnings, or, in case of loss, charged the same to its own profit and loss account. *Held*, that the stevedoring company had no such separate existence as to protect the Foard Company from liability for the damages caused by the negligence of its employé.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1210–1216; Dec. Dig. § 301.*]

3. EXPLOSIVES (§ 8*)—INJURIES FROM ACCIDENTAL EXPLOSION—LIABILITY OF CARRIERS.

The collection by a steamship company of a large quantity of dynamite in a harbor for shipment is not in itself a nuisance which alone renders the company liable for any injurious consequences which may result, but it is liable only for negligence in the handling of the explosive.

[Ed. Note.—For other cases, see Explosives, Cent. Dig. §§ 4, 5; Dec. Dig. § 8.*]

4. MASTER AND SERVANT (§ 319*) — PERSONS LIABLE — NEGLIGENCE OF INDEPENDENT CONTRACTOR.

One is liable for injuries caused in the doing of work by an independent contractor employed by him if the danger of such injury is inherent in the work done, unless means are taken to prevent it, and such means are not provided for, but not where the danger lies only in the possibility that some one engaged in doing the work may do any one of a number of careless acts.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1259, 1260; Dec. Dig. § 319.*]

5. MASTER AND SERVANT (§ 120*)—MASTER'S LIABILITY FOR INJURIES TO SERVANTS—SAFE PLACE TO WORK.

The fact that an unfinished vessel on which employés of the builder were working, and which lay in an authorized anchorage ground in a harbor, was within 1,200 feet of another vessel loading with dynamite did

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

not render the builder liable for injuries to employés from an explosion of such dynamite on the ground that it furnished an unsafe place to work.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 211; Dec. Dig. § 120.*]

**6. MUNICIPAL CORPORATIONS (§ 849*) — LIABILITY FOR TORTS — EXERCISE OF CHARTER POWERS.**

A city cannot be held liable for damage caused by an explosion of dynamite when being loaded on a ship in the harbor, because it designated the place where such loading should be done, where the location was selected by a competent official acting with due care and in good faith.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1806; Dec. Dig. § 849.*]

**7. MUNICIPAL CORPORATIONS (§ 849*)—LIABILITY FOR TORTS—FAILURE TO EXERCISE CHARTER POWERS.**

The provision of Acts Md. 1908, c. 148, which confers on Baltimore City the power to "provide for the preservation of the navigation of the Patapsco river and tributaries * * * and the removal therefrom of anything detrimental to navigation or health, to provide for and regulate the stationing, anchoring and moving of vessels," etc., did not require the city to make regulations governing the loading of ships with dynamite, and it cannot be held liable for injury to persons or property by an explosion of dynamite because it failed to make such regulations.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1806; Dec. Dig. § 849.*]

In Admiralty. Suits by the State of Maryland, to the use of Frances Goralski, widow, and Mary Goralski, infant, Joseph Gielner, and Andrew Gielner, against the General Stevedoring Company, the Joseph R. Foard Company of Baltimore City, the Mayor and City Council of Baltimore City, and the Munson Steamship Line, and by Gustav Lies against the same respondents and the Maryland Steel Company, with sixteen other cases. Decrees for libelants against the General Stevedoring Company and the Foard Company, and for the other respondents.

Thomas Cadwallader, J. Morfit Mullen, George Dobbin Penniman, Gans & Haman, and Charles Markell, all of Baltimore, Md., and Convers & Kirlin and Russell T. Mount, all of New York City, for libelants.

George Forbes, Joseph C. France, and W. Irvine Cross, all of Baltimore, Md., for Joseph R. Foard Co. and General Stevedoring Co.

Alexander Preston, of Baltimore, Md., for Mayor and City Council of Baltimore.

Haight, Sandford & Smith and Charles S. Haight, all of New York City, for Munson S. S. Line.

ROSE, District Judge. On the morning of March 7, 1913, the British steamship Alum Chine lay at anchor in the quarantine anchorage of the port of Baltimore. It was to the westward of the Ft. McHenry Channel leading to the city wharves. It had nearly 300 tons of dynamite on board. A score of men were busy stowing this cargo in the forward hold. Two or three minutes before 10:30 there was an explosion in their midst. It sounded something like the report of a pistol. Two or three of those nearest it were slightly hurt. All

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

in the hold were frightened. They clambered to the deck. The tug Atlantic and the launch Jerome were alongside. The fugitives sprang on them. The panic rush and the cries of fire spread the alarm to most of the 20 other persons on board. They, too, sought refuge on the smaller vessels. The latter pushed off. They reached a point of comparative safety. Smoke and flames in ever increasing volume were pouring out of the forward portion of the Chine. In their midst William Van Dyke, the master of the Atlantic, saw men on the bow of the doomed ship. By signs and gestures they appealed for help. In brief question he sought the advice of his mate, Henry M. Diggs, and his engineer, William W. Marshall. The answer was:

"While there is life there is hope; if there is any chance of saving the men, try to do it."

He turned back into what had become the very jaws of death. The tug Atlantic reached the Chine. Two men jumped from the ship to the tug. It again started away. It had gone but a few feet when at 10:40 there was a terrific explosion. The whole forward portion of the Chine was blown to pieces. All of it instantly sank. More than 20 persons on the Atlantic were killed or fatally wounded. Among the former were its captain and its first officer. Many more were seriously injured. The explosion brought wounds or death to a number on another steamer, the Jason, lying 1,200 feet away. In all more than 30 lives were lost. Much injury was done to property. Twenty-five libels seeking compensation for the death of 14 persons, for the wounding of 24 others, and for damage to the property of two corporations, have been filed. They have been heard as one case. Otherwise than in admiralty it would have been difficult to have proceeded with such directness, economy, and dispatch.

### The Parties and the Issues.

The libelants may be classified as: (1) Stevedores working on or about the ship and engaged in the loading of dynamite thereon, or surviving dependents of such stevedores. (2) The owners of the ship. (3) Persons who had no contractual relation with any of the defendants, but who were lawfully in the vicinity of the ship in the prosecution of their own affairs, and who were injured by the explosion, or who are dependent upon persons in like situation who were killed by it, and owners of property which at the time of the explosion was in the neighborhood and suffered from it.

In all there are five respondents, although not all of them have been sued in every case. They are: (1) The General Stevedoring Company. (2) The Joseph R. Foard Company of Baltimore City. (3) The Munson Line. (4) The Maryland Steel Company. (5) The mayor and city council of Baltimore. They will be referred to as the "Stevedoring Company," the "Foard Company," the "Munson Line," the "Steel Company," and the "City." The steamer upon which the explosion took place will be called the "Chine."

All the respondents are corporations; four of them private, one municipal. The Stevedoring, the Foard, and the Steel Companies are incorporated under the laws of Maryland, the Munson Line under

those of New York. The last named held the Chine under a time charter. It instructed the Foard Company to have the dynamite placed on board the Chine. All the stock of the Stevedoring Company is owned by the Foard Company. The Stevedoring and the Foard Companies say the former was doing the actual work of stowing the dynamite. The libelants claim that the Munson Line and the Foard and the Stevedoring Companies are liable because they undertook to handle a dangerous explosive in a place and under conditions in which if it did explode much damage to life and property would result, and, secondly, because the explosion was caused by the negligence of persons for whose actions they are liable.

The Steel Company had built the collier Jason for the United States government. It was about to be sent on its trial trip. Those on board it were employés of the company. They or the dependents of those who were killed seek to hold it responsible because they say it did not use reasonable care to furnish them with a safe place in which to work. With the knowledge that the Chine was loaded with dynamite, it unnecessarily anchored the Jason in the vicinity.

### Uncontroverted Facts.

The Chine was a steel vessel. It was built at Cardiff in 1905. It was of 1,797 gross and 1,140 net tonnage. It had a cargo capacity of about 3,000 tons of dead freight. It was about 270 feet long. It was owned by the Alum Chine Steamship Company, Limited. It had come to Baltimore to take 300 tons of dynamite to Minde, Isthmus of Panama, and 2,220 tons of bituminous coal to Port Limon, Costa Rico. The coal was shipped by the United Fruit Company to the Northern Railway Company, the dynamite by the Keystone National Powder Company to the Isthmian Canal Commission. This dynamite had been manufactured at Emporium, Pa. The Pennsylvania Railroad had brought it to Baltimore. It was put up in 12,000 boxes. Each of these held 50 pounds of dynamite. The boxes themselves and the pasteboard cartons in which the sticks of dynamite were packed brought the gross weight of each package up to 57 pounds. The explosive was of the kind known to the trade as saltpeter dynamite. 7,000 cases of it were of 45 per cent. dynamite; the other 5,000 cases of 60 per cent. dynamite. The dynamite was in sticks 8 inches long. In 1,000 cases of the 60 per cent. dynamite they were each 2 inches in diameter, in the other cases 1¼ inches. The Chine had taken on her bunker and cargo coals at the Baker-Whiteley Coal Company pier at Canton. The latter had been furnished by the Jamison Coal & Coke Company, whose mines are situated on the Alexander branch of the Pennsylvania Railroad Company. There were in all 49 car loads of it. Twenty of these came from the Jamison Company's No. 2 mine, 19 from its No. 4 mine, 5 from Hempfield mine No. 3, and 5 from the Salem colleries. Some of this coal left the mines as early as the 20th of February, some of it as late as the 28th. Seven car loads of it were delivered to the steamer on the 3d of March, the balance on the 4th and 5th. The after hold of the ship was

completely filled with coal. The forward hold was 22 feet deep. It was filled to the depth of 15 feet with coal.

There were laid lengthwise of the ship on top of the coal inch boards. They were from 8 to 12 inches wide and about 6 to 8 inches apart. At right angles across them and athwartship like boards were placed with intervals of from 4 to 6 inches between them. Wooden battens were fastened on the cargo strips. A cage to hold the dynamite was in this way constructed. Five sides of it were of wood. The top was the steel deck of the ship. The room thus formed was over 100 feet long, 36 feet wide, and approximately 7 feet high. Into it there opened two hatches—Nos. 1 and 2. Each of them was 16 feet wide. No. 1 was 20 feet long; No. 2, 24 feet. The only other openings into this hold were through two ventilators. The after of these came up through the deck immediately aft of No. 2 hatch. The forward ventilator passed up from the hold through the petty officers' quarters on the port side of the forcastle alleyway and from thence through the forecastle head. It was not shown that there were any openings in this ventilator between the hold and the place at which above the forecastle head it opened into the external air.

After the coal had been placed on board, the Chine went to the quarantine anchorage to receive the dynamite. The loading of the latter began on the morning of March 6th. A car-float was towed down from the Pennsylvania Railroad piers at Canton. On this float were the cars loaded with dynamite. When brought alongside of the ship their seals were broken. Their contents were delivered to the stevedores actually at work. For the purpose of receiving this delivery the stevedores acted as the representatives of the Foard Company, which, in its turn, was the agent of the Munson Line. The loading of the dynamite would ordinarily have been completed on the 6th. A squall, however, sprung up, the car-float broke loose and drifted down towards Ft. Carroll. It was caught by a tug and towed back to Canton. The loading of the dynamite was not resumed until the next morning, the 7th. Then the car-float was brought down by the tug Atlantic. It was made fast to the port side of the Chine in such a way that one car door was directly opposite hatch No. 1 and another hatch No. 2. A wooden chute was placed in the door of the car so as to extend over the rail of the ship to the hatch combing. A similar chute reached from the hatch combing into the hold. In these chutes were little wooden tracks. Along the tracks the boxes slid. This method of loading had been exclusively employed during the whole of the 6th and on the morning of the 7th up until a short time before the explosion. The loading through No. 1 hatch having been then nearly completed, the chute had been taken out of it, and the boxes were thereafter passed down by hand. The 60 per cent. dynamite had all been stowed on the 6th. It had been packed in the extreme forward part of the hold. The officers of the ship thought she was a little down at the stern. To correct this tendency the forward part of the hold was completely filled by the dynamite, leaving a space of from six inches to a foot between it and the deck.

When trouble was first detected on the Chine, the tug Atlantic was

lying in such a position that its bow touched and extended for a short distance along the port quarter of the car-float. The gasoline launch Jerome was lying to the stern of the float alongside the ship and between it and the tug. It was about opposite the amidship of the Chine between the bridge and the engine room. The collier Jason was anchored in the quarantine anchorage to the starboard of the Chine. The wind was blowing strong from the northwest. Both ships were swinging to it and heading about northwest. The witnesses, as usual, differ as to the distance between them. It was apparently about 1,100 or 1,200 feet. The two ships were lying substantially parallel and in such a position that the Chine, which was only about half the length of the Jason, was almost abreast of the center of the latter. The tug, Mary B. Riehl, at the time when accuracy of observation first became important, was lying alongside the port quarter of the Jason. The tug Britania was then in the dredged channel leading to the Curtis Bay coal pier. It was going east and had just passed Sledd's Point. It was about three miles distant from the Chine. The tug Curtis Bay had just come out of the oil wharf to the west of Fishing Point and was something over two miles from the Chine.

The final and disastrous explosion was admittedly the result of a fire which had broken out on the Chine at least ten minutes before the great catastrophe. The vital controversy of fact in the case is as to the origin of this fire.

### Did a Blow by a Bale Hook Cause the Disaster?

The libelants say that while one Bomhardt, a foreman of the stevedores, was in the forward hold and between the two hatches, he struck a box of dynamite a hard blow with a bale hook. The slight explosion already alluded to followed. According to them it caused the fire.

There is no doubt that there was a small explosion and that it took place in the forward hold of the Chine within a foot or two of where Bomhardt was. Twenty-four witnesses testify to hearing it. It was the first thing to alarm any one on board the Chine. Whatever it was and whatever was its cause, it greatly terrified all the men who were in the hold or who were looking into the hold through the hatches. They fled so precipitately and were so panic stricken that none of them saw, or if they saw cannot remember, except in the vaguest way, the appearance of anything in the hold after it took place. They were all longshoremen or carpenters employed to aid in making snug stowage, except one gentleman who was an inspector sent by the Isthmian Canal Commission to see that the dynamite was stowed in such manner that it could be safely transported. The flight of these men, the noise and cries of fire accompaning it, and the smoke which very shortly manifested itself, spread the alarm through the ship.

There is no dispute that Bomhardt did use a bale hook upon a dynamite box within a few seconds before the small explosion took place, nor is there any contention as to the purpose for which he used it. The loading of the dynamite had been nearly completed. There were only a few hundred more cases to be stowed. At the place at which the men were working three tiers of dynamite boxes were al-

ready on top of the coal. Each box was 26½ inches long, 10 inches wide, and 8½ inches high. The stevedores who were putting the fourth tier of boxes in place had some 2 feet of dynamite beneath them. The boxes had been laid fore and aft the ship. To complete one row of this fourth tier one more box was required. One of the gang attempted to fill the vacant space with such a box. He found, the box a little too long to fit in. He started to place it athwart ship. Bomhardt wanted it arranged as the others had been. In the interest of good and safe stowage it was desirable that the boxes should. be closely fitted together. He was therefore right in wishing to have this box placed, if it was possible to do so, in the same direction as the others had been. He tried so to place it by performing an operation which the witnesses refer to as "marrying" this box with the one in front of it. That is to say, he lifted that end of each box nearest the other so that the lower edges of these ends came together. This left, of course, a V-shaped space between the upper parts of the box ends. He then tried to force both boxes down together into the position desired. It was cold in the hold. He had gloves on. His hands slipped, and one of the boxes fell down. He called for a bale hook. A member of his gang handed him one. He raised the box nearest to him with this hook while lifting the box farthest from him with his other hand. After he got the boxes into the marrying position, they dropped down. The end of the further box rested on the end of the nearer. He tried once more. He again used the hook.

Up to this point there is no very important difference between the account given by Bomhardt and that of the other witnesses. Some of them say that he had another man hold the farther box for him. A number of them testified that his repeated failures to accomplish his purpose made him very angry and led him to use some loud and profane language. Others quite as close do not recall those circumstances. He was inclined to be violent and boisterous. It is not possible to say whether the witnesses who testified that he appeared to be angry and was profane, or the others who recall nothing of the kind, are the more accurate. If he used such language it meant little. His employment of it would in itself have made but slight impression on those who knew him. It may be more significant that he found it difficult to accomplish his purpose and several times failed in so doing. He says that, when he got the boxes into the marrying position for the last time, he threw the hook behind him and started to force them into place. While so doing, the near end of the box farther from him exploded. He was wounded in the face. On the other hand, 13 persons, who claim to be eyewitnesses, say they saw the box explode when Bomhardt struck it the second time with the hook. These witnesses were examined in open court. Some of them were Poles or Bohemians, and some were negroes. They testified as to what they at least thought they saw. Four other persons who were in the hold at the time have been examined. Three of them were, produced as witnesses for the respondents. Two of them had their backs turned to Bomhardt at the time, and while they heard the explosion do not know what caused it. The foreman of carpenters, a

Mr. Kirkham, testifies that, while he was 15 or 16 feet away from Bomhardt, he was looking at him at the time, and when the explosion happened Bomhardt did not have a bale hook. He also says that he had not seen a hook in Bomhardt's hand for ten minutes before the explosion. He appeared to be a respectable man. If the other witnesses are to be believed, there must have been a number of men around Bomhardt, some of whom were more or less directly between him and Kirkham. The latter testified at the coroner's inquest, held a few days after the explosion. If his evidence there given was correctly recorded, he at that time seemed, on account of the number of people near Bomhardt, doubtful whether he could say positively that the latter had or had not the hook in his hands. The testimony of one other person in the hold at the time has been taken. He was a Mr. Bradyhouse, an inspector representing the Isthmian Canal Commission. His business was to see that the dynamite was snugly stowed for the voyage. He was not produced in court, but by consent his testimony before the coroner was allowed to come in. He saw a flash. Unlike everybody else in the hold or near it, he heard no report. He does not say whether he saw a bale hook in Bomhardt's hands or not. He stated that he did not know what caused the explosion.

One other stevedore testified at the coroner's inquest. He had left the city before the trial of this case. When he was examined before the coroner, the respondents had no opportunity to cross-examine him. They were unwilling that the evidence he then gave should be here read. There were two other carpenters in the hold and doubtless other stevedores. Some of them may have been among those killed. At all events, they have not testified.

The overwhelming weight of the testimony is therefore that the explosion occurred when Bomhardt struck a box of dynamite with a bale hook.

The account the stevedores now give of the accident was current among them within less than 24 hours after the happening of the events described. Most of them were examined before the coroner's inquest. Their testimony was stenographically recorded. Copies of it were in the hands of counsel for the respondents before and during their examination in this case. There is nothing to indicate that any other story of the accident was ever told by any of them, although, of course, in some instances their testimony in court and before the coroner differed in details.

Bomhardt escaped on the Jerome. He at first said nothing to any one. He sat with his face in his hands. It was noticed that he was bleeding. A witness went to him, raised his head, and recognized him. He told the man who bound up his head that a case had burst. This brief colloquy took place before the final explosion. His credibility as a witness is impaired by the fact that it seems to be established that on the morning after the accident he insisted that he never used a bale hook at all.

Unless the evidence in this case is to be weighed in some unusual way, it must be found as a fact that the small explosion which ad

mittedly took place instantly followed the last blow given by Bomhardt with a bale hook to a box of dynamite.

The respondents answer that it is impossible that such a stroke could have caused the explosion. They say that it would be extremely difficult for any one to hit a box containing dynamite with a bale hook with sufficient force to explode the contents. It would require a blow harder than any sane man who did not wish to commit suicide would have given.

### Was Bomhardt Intoxicated?

There is a suggestion that Bomhardt was intoxicated. Most of the Polish and Bohemian stevedores seem to be of that impression, although only two of them go so far as to say so in so many words. None of the other witnesses on either side noticed anything unusual in his condition. He himself testifies that before going to work that morning he had gone into a saloon and taken a ten-cent drink of sherry. One of the other witnesses says he was in the habit of so doing. He himself testifies that he had not been drinking the night before. Five of the Slavic stevedores say that he took another drink out of a bottle as they were bound down on the car-float. He denies it, as does the man who they say gave him the liquor. It is not necessary to decide who are in this respect the more accurate. Bomhardt was not drunk. It is obviously impossible to say whether he was or was not more irritable and excitable than he would have been had he had nothing to drink. Those who say that he was intoxicated doubtless think so. One of the witnesses produced by the respondents knew Bomhardt well for 20 years. He said that the latter was always whooping and hollering. The inspector of the Isthmian Canal Commission testified before the coroner's inquest that on the morning of the accident the stevedores were working very rapidly. They seemed to be very anxious to get through. To his apprehension, they were acting recklessly. They would use one case of dynamite as a ram to drive another into a tight place. After marrying the boxes, they would get on them and try to force them into place with their weight. At other times they kicked the cases.

In weighing this testimony it must be remembered that Mr. Bradyhouse was not subject to cross-examination, and that this was the first occasion upon which he had seen dynamite loaded. On the other hand, Bomhardt had been engaged in loading many cargoes of dynamite. He had become familiar with it without ever having, so far as appears, received any special instruction as to its peculiar nature and dangers. He was uneducated. He was bold and pushing. His knowledge of dynamite was limited. Such a man might take chances which would not have been taken by either an absolutely inexperienced person or by one with a greater acquaintance with the explosive and its peculiarities. To Bomhardt and some of the other stevedores, the loading of dynamite appears to have been very much like the loading of anything else. It was paid for at precisely the same rate as was the loading of flour or canned goods or anything of that kind. There was the same necessity for haste if the work was to be profitably done.

### Is Libelants' Theory Impossible?

The respondents further contend that whether Bomhardt was wise or foolish, careful or reckless, sane or insane, drunk or sober, it is a physical impossibility that he could have caused the destruction of the ship in the way he is alleged to have done. The explosion was powerful enough to cut the faces of two or three men. Bomhardt and some of the libelants' witnesses who were in the best position to see say that it burst the box within two or three feet of which they were. How could all this have occurred without anybody being killed or even seriously hurt? The respondents pertinently urged that it is hard to imagine how the blow that was given could have brought about the explosion. If it did, it is still harder to believe that it would not instantly have caused a much greater one.

They have examined Dr. Munroe, one of the greatest living authorities on explosives. He in general very forcibly and ably supports their contentions. He, however, states that a minute portion of the dynamite might have been exploded and produced the effect described by the witnesses. Such explosion could have set fire to the paper or the box or something else. That fire might have gradually spread into a conflagration which in a relatively few minutes blew up the ship. Such results could have followed the blow provided the dynamite was frozen or partly frozen. He believes that it was frozen. The temperatures at the time and for some days before were low enough to freeze dynamite, the freezing point of which he fixes as high as 52 degrees Fahrenheit. At the time of the explosion the temperature was about 21. Dr. Munroe finds confirmation of his opinion that the dynamite was frozen in the fact that after the catastrophe unexploded portions of sticks of it were found on the Jason. Whole boxes of it still unexploded were recovered from the water.

Respondents do not question that the dynamite was frozen. Indeed, it is a part of their case that it and all of it was frozen. They emphasize this fact because it is usually much harder to explode frozen than unfrozen dynamite. If that in the box and all of it had been frozen when Bomhardt gave the blow with the hook, it would have been more difficult to have exploded any of it than it would have been had some or all of it been unfrozen. On the other hand, if a very small portion of it had been exploded by the blow, the fact that the rest of it was frozen would account for what subsequently happened. Dr. Munroe says that frozen dynamite is a more erratic substance than the unfrozen article. It is more difficult to say definitely what it may or may not possibly do. Dynamite which has been frozen and then thawed or partly thawed and then partly frozen again is still more uncertain in its action. When dynamite which has been frozen thaws, some of the nitroglycerine is likely to exude. It may form a film upon the surface of the stick. That film is more sensitive to heat and shock than the compound mixture.

From the time the dynamite left the factory until the explosion the temperature had been both above and below its freezing point. For 24 hours or more before the disaster it had been constantly below. That the accident happened as libelants contend that it did appears

to be possible. Theoretically the chances of it so happening would be so small as to be difficult of expression in mathematical terms. Nevertheless there was an explosion. No reasoning can alter that fact, however strongly it may compel us to look elsewhere for the cause.

### Was the Chine on Fire Before the Small Explosion?

Respondents say that fire broke out on the Chine before the small explosion in the hold. That explosion was itself one of the results of the conflagration which ultimately resulted in the great explosion. It was not the cause. To support this contention they have produced some 18 persons who agree in testifying that they saw smoke coming from some part of the forecastle head of the Chine before they saw smoke coming from any other part of the vessel. The wind at this time was blowing somewhat briskly from the northwest; that is, from the bow towards the stern of the ship. These witnesses were on some of the vessels already mentioned. Some of them, it is true, were two or three miles off. The larger number were not over 1,200 feet away, or perhaps materially less, and viewed the Chine from angles which it may be argued should have made it rather easy for them to say at what point above the ship's rail the smoke manifested itself. Some of these witnesses are, moreover, experienced seafaring men whose observation in such matters would be more likely to be accurate than those of less trained people.

Respondents contend that this testimony shows: First, that smoke was seen coming from the Chine before the Bomhardt incident happened; and, second, that even if there be a doubt on that point it is established that the first visible smoke which came from the vessel came from some part of the forecastle head and that such smoke could not have been the result, mediately or immediately, of the Bomhardt incident.

The evidence does not sustain the first of these contentions.

Of the 18 persons referred to, 2 were on the Atlantic. They expressly say that they saw nothing until after the cry of fire had been raised on the Chine. The captain of the Britania looked at his clock when he first saw the smoke. It was 10:34. By the same timepiece the final explosion occurred at 10:40. At least ten minutes, and probably two or three minutes more, elapsed between the small and the great explosion. Capt. Owen A. Thompson of the Curtis Bay, which was more than two miles away, first noticed the smoke at 10:30. He also recorded the explosion as taking place at 10:40. Two other witnesses in his tug, when their attention was first directed to the Chine, saw flame coming from its forecastle head. No flames were discoverable even from the Jason until some time after the small explosion must have happened. Five of the witnesses were on the Riehl. Three of them, Capt. Heywood and Messrs. Martin and Hetherton, testified that the last named was to their knowledge the first to notice smoke from the Chine. He had come down from the Jason. He discovered the smoke as he stepped aboard the tug. According to their estimate, a minute or a minute and a half later they saw men

running aft on the Chine. None of them saw the men who came up out of the hold through the two forward hatches. About two minutes after they first detected the smoke they saw the Atlantic push off. Marshall, of the Atlantic, says that the Atlantic did not leave until three to five minutes after the cry of fire was raised on the Chine. It is to be remembered that the Atlantic before leaving had pulled up alongside of the car-float so as to give the men a better chance to get aboard.

As events showed, Capt. Van Dyke and his officers were not likely to have left until they had given what they thought was sufficient opportunity to every one to escape. It was when Messrs. Martin and Hetherton saw the men of the ship's crew who had been at work on the after deck running that they urged the captain of the tug to get away from the Jason. Grassmick, the engineer of the Riehl, says he did not see the smoke until after the Riehl had gotten under way. Pierce, the mate of the Riehl, differs in recollection from Capt. Heywood and thinks the smoke from the Chine was called to the attention of the captain by a fireman about a minute before Mr. Martin came aboard. It was, unfortunately, not possible to take the testimony of the fireman in question. Pierce fixes the Atlantic's leaving at about three to five minutes after he first saw the smoke, which is precisely the same estimate made by Marshall as to the time which elapsed between the cry of fire on the Chine and the departure of the Atlantic. Pierce estimates that there was about ten minutes between the time at which he first saw smoke and the great explosion. The remaining seven witnesses who testified as to seeing smoke coming out of the forecastle head or its after bulkhead were on the Jason. Of these, three—the captain, Mr. Johnson, and the colored steward Hammond—say that when they first noticed the smoke the Riehl had already left the Jason. Quite certainly, therefore, none of them saw it before it was observed from the Riehl, and Hammond's estimate that it was four minutes after he saw the smoke before the Atlantic left must be taken in connection with that of the apparently much more accurately minded witness, Martin, that it was about two minutes. Boatswain Wilson of the Jason did not see the smoke until the Atlantic was pulling away from the Chine. He thinks this was only about five minutes before the great explosion. Chief Officer Andrews of the Jason did not notice the smoke until the Atlantic pulled off and until, as he thinks, about seven minutes before the explosion. It was he who gave the first notice to Capt. Thompson of the Jason. Engineer Winship of the same vessel heard some one say that there was fire on the Chine. He looked and saw smoke. He went below to get his engine ready to leave. He came back just before the great explosion. He does not remember seeing anybody on the decks of the Chine. He thinks it was about ten minutes between the time he first saw the smoke and the explosion.

There remains only the witness Lang. He so expressed himself in his examination in chief as to be understood to say that he saw a bunch of men getting over on the scow and that he saw the smoke about six or seven minutes before he saw the men coming from the

hatch. On cross-examination his attention was called to some testimony he was said to have given at the inquest. He thereupon explained that he had never intended to say that he ever saw more than one man coming out of the hatch and that was after the Atlantic had left. The man in question was doubtless one of those for whom the Atlantic returned. He says he had been watching the men slide the boxes down the chutes; that he kept his eyes on the Chine from the time he saw the smoke until after the explosion. It is not easy to make a connected and consistent story out of his account. It may be suggested that perhaps he meant that though he did not see the men as they climbed out of the hatches, and perhaps could not, he did see them when they ran over the scow. It is hard, however, to suppose that that was what he intended. He says the explosion occurred in five minutes after he saw the bunch of men get on the scow. He states that he had seen the smoke for from six to seven minutes before he saw the one man come out of the hatches, but according to him the man did not appear until after the Atlantic had left. When the first rush across the scow took place, the Atlantic was still by its side.

This witness, together with Anderson, Martin, Hetherton, Johnson, Winship, and Hammond, who were apparently among those who earliest noticed the smoke, saw it come out from under the forecastle or from an opening in the after bulkhead of the forecastle, or up along that after bulkhead. All these descriptions point to its coming out of the forecastle alleyway. Had there been any smoke there before the explosion in the hold, or within a minute or so afterwards, it could not have failed to have attracted the attention of some of the witnesses who were then on the ship. One of the stevedores had been to the toilet in the forecastle head, had come out through this alleyway, and had gotten as far as No. 2 hatch, and was climbing down the ladder into it, when the Bomhardt explosion took place. He must have passed out through the opening not more than a minute preceding the small explosion. He noticed no smoke or anything else to alarm him until the Bomhardt incident happened. One of the crew of the Chine was asleep in the crew's quarters in the forecastle head. He was aroused by the noise made by the escape of the men from the ship. He ran out through the opening. He did not notice any smoke or fire there. The second officer of the Chine testified that at the time of the Bomhardt explosion he was on the forecastle head eight or nine feet forward of the hatchway. He noticed nothing wrong until the small explosion in the hold.

The record contains the testimony of 36 persons who were on the Chine, of two on the car-float, of a like number on the Atlantic, and of one on the Jerome. No one of them saw or suspected anything wrong until after the small explosion in the hold took place.

Respondents point out that many of the witnesses on the Chine went through such experiences and were so excited and alarmed that their testimony is not as reliable as that of more favorably situated persons who were on the other vessels. From many standpoints the observation is doubtless just. All the testimony, however, shows that

every one on the Chine instantly fled the moment he saw or heard anything which to him suggested that anything alarming had happened. It is certain that no one did flee until after the explosion in the hold.

It is found as a fact that no one on or off the Chine saw smoke or other evidence of fire on board that ship until after the small explosion had taken place.

Respondents say that, even so, the first smoke which was seen could not have come from any fire caused by that explosion. In their view there must have been another fire which originated either prior to that explosion or at all events simultaneously with it. It was this fire which gave off the smoke which was first seen from the other ships. The four witnesses from the Britania and the Curtis Bay were too far away to make it possible for them to speak more definitely than to give their opinion that the smoke or flame came from the forward part of the Chine. Among the other 14 persons who from the other ships testify on the subject, there is considerable difference of opinion as to the place from which it did come. Two of them, Pierce and Heywood, think it came from the windlass, which was about in the center of the forecastle head 14 feet, or thereabouts, forward of the after bulkhead. Comegys and Grassmick think it came aft the windlass and out of the ventilator. Capt. Thompson of the Jason simply says it was unmistakably coming out of the forecastle, but does not specify further than to mention that he at first thought it was steam from the windlass. Nine others all in varying phrase say it came out of the after bulkhead or out of the opening in the after bulkhead; that is to say, the forecastle alleyway, or right up from the deck against the after forecastle bulkhead. This after bulkhead was 4 feet in front of hatch No. 1—14 feet in front of the strong—back of that hatch. It will be noticed that those witnesses who thought that the smoke came from the windlass put it as far forward of the after bulkhead as the after bulkhead witnesses locate it forward of the center of hatch No. 1. Precise accuracy of observation in such matters is not possible.

That the small explosion in Bomhardt's vicinity did cause a fire is absolutely established. The cry of fire from those who saw the explosion, and the rush which followed it, gave the first warning to Marshall and Comegys on the Atlantic, as well as to many persons on the Chine, that there were trouble. That no fire manifested itself in the forecastle at the time of the small explosion or for a minute or two afterwards has already been shown. Any fire subsequently breaking out there might have been caused by that which originated in the hold. There were too many people on deck about the hatches and in the hold under the hatches to have made it possible for the explosion which took place in the hold to have been caused by a spark coming down through the hatches and igniting any gases which might have been below. That possibility is negatived by the same testimony which has demonstrated that there was no visible fire in the forecastle before the Bomhardt explosion.

213 F.—5

Respondents say that, even if so much should be found against them, it does not show that there might not have been a fire in the hold itself which preceded and caused the small explosion. This fire is supposed to have originated or to have first manifested itself in the form of smoke in the forward part of the forward hold. Much has been said of the properties of marsh gas or methane and of the circumstances under which it comes from coal and may cause explosion. It would seem, however, that it could not have produced this disaster. The expert testimony on the question seems to show that under all the conditions it was not likely that the coal in this hold would give off any dangerous quantity of it. What is, however, more conclusive is that it would not explode until it came in contact with spark or flame. What has already been said shows that there was no possibility of any such contact originating at any point above the surface of the coal. That the fire started otherwise than as a result of something that happened to the boxes of dynamite with which Bomhardt was working narrows itself by elimination to the claim that there was spontaneous combustion in the coal.

Bituminous coal under favorable conditions does sometimes spontaneously ignite. Such ignition is a recognized danger. Respondents do not claim that in the hold of ships it is what could by any fair use of language be described as a common occurrence. If it were, it would obviously be dangerous to carry dynamite in the same compartment, or perhaps in the same ship, with coal. Those who had a hand in stowing the dynamite and coal in the proximity in which they were placed on this ship would be liable for the consequences. In point of fact, however, it is the usual practice to carry dynamite on coal ships. The practice is approved by the underwriters. No evidence has been given of any accident that has ever happened therefrom. Nevertheless, if spontaneous combustion does sometimes occur in coal, it might have occurred in this coal provided the conditions necessary to it existed. The evidence does not, perhaps, altogether explain what those conditions are. Very possibly they are not fully known. None of those which are usually recognized as contributing to such a result existed in any supposedly dangerous degree in the cargo in question. None of it had been in the ship's hold more than four days; most of it a still shorter time. The temperatures in the hold were very low. Something has been said as to the possibility of the coal having been heated from the boiler room fires. The evidence shows that the hold was separated from the engine room by a steel bulkhead, then there was six inches of open air space, and then a three-inch wooden bulkhead. Moreover, this bulkhead was more than a hundred feet away from the forward ventilator. If the smoke which witnesses think they saw coming out of the forecastle came from fire in the coal, it must have come up through the forward ventilator, and that was more than a hundred feet from the engine room bulkhead, and between the two 20 men had been working some hours. Though they were working hard, the hold to them seemed very cold. That the engine room fires in any way contributed to the disaster may be dismissed from consideration.

It is suggested that spontaneous combustion did begin in the coal, not in the after part near the engine room bulkhead, but in the forward part under the forecastle head and forward of all hatches. It is surmised that pockets of coal gas or of methane had formed at intervals in the coal or under the dynamite boxes. The fire kindled in the coal ignited one of these pockets and that fired another, and so on until, just as Bomhardt struck the box with his bale hook, the explosion of one of these pockets took place immediately under the three tiers of boxes upon which he was standing; that such explosion caused the report, the smoke, the dust, or the flame, or whatever it was the men saw, and caused the injury to Bomhardt and to the one or two other men who were hurt. The theory does not sound probable. Respondents answer that the explosion did take place and that no theory of it is probable. That is true. But this theory they put forward has no evidence in its support except the testimony of witnesses that smoke came from a point forward of the hatches. But if that smoke came from the coal, as already pointed out, it could have manifested itself in the forecastle only by coming up through the forward ventilator which passed through the forecastle head. It is significant, however, that only a very few of the witnesses thought that it came from the ventilator. The large majority of those who were in a position to speak with any definiteness said, as has been already stated, that it came out of the forecastle alleyway or up against the after bulkhead of the forecastle. Smoke which came from a fire in the coal in the hole could not have shown itself there. There was a steel deck in the way.

The explanation of where the smoke came from is in fact suggested by the testimony of two of the most intelligent witnesses whom the respondents called upon to speak upon the subject. Mr. Martin said that:

"The smoke came up clinging to the bulkhead. * * * As soon as the smoke came up the forecastle bulkhead on a level with the forecastle head, it was blown by the wind aft."

And Mr. Hetherton said:

"The smoke was coming out just like you would kindle a fire, and as it came up to the height of the wind it beat it down—it kept beating it down."

Other witnesses say that it came up apparently clinging to the after forecastle bulkhead. The top of that bulkhead was some feet higher than the hatch-combings. The wind was blowing aft over the top of the forecastle head. Under such conditions it is not impossible, or perhaps very improbable, that the wind would beat down the smoke as it came from the hatches and cause an eddy or back draft which would carry it up along the forecastle bulkhead.

There were only four feet between this bulkhead and the forward part of hatch No. 1. Respondents insist that hatch No. 1 was covered so that the open part of that hatch was 14 feet from the bulkhead. They seriously question the possibility that smoke coming from hatch No. 1 could have by any back draft been forced over this 14 feet. It is, however, by no means certain that the forward part of

hatch No. 1 was covered completely, if at all. Kirkham, it is true, says:

"That partly the forward hatches were on. There was a strong-back in the center of the hatch. The forward hatches were on; I remember that well."

Two men who passed on another vessel 200 or 300 feet away some little while before the trouble claim to be positive in their recollection that the forward part of hatch No. 1 was covered, and Kaiffer, the Stevedoring Company's assistant superintendent, thinks that the forward part of hatch No. 1 was on. On the other hand, one of the colored stevedores testifies that both the hatches were open, and more significant still is the testimony of Dorgan, one of the carpenters, a witness produced by the respondents, who testifies positively that he made his escape by going up the permanent iron ladder which came up at the center of the forward end of hatch No. 1; that is, at a point which must have been directly opposite the opening of the forecastle alleyway and only four feet aft of it. I see no reason to doubt that he is entirely accurate in his testimony in this respect. It may be that all the covers had been put on the forward section of No. 1 hatch except those which covered this ladder, and that they had been left off for convenience of ascent and descent. If such was the case, there would be the greater probability that the smoke from the fire starting in the hold at the time of the Bomhardt incident might have manifested itself where it did to observers at a distance. It must be borne in mind that most, if not all, these observers were unable to see the hatches themselves because of the well deck construction of the ship.

It should be found as a fact that whatever fire was on the ship originated at the time and place at which Bomhardt struck the dynamite box with his bale hook.

By a fair preponderance of evidence the libelants have shown that the disaster happened because he did strike the box with that hook. If the results which followed were probable ones, or even such as would happen on an appreciable minority of occasions when the circumstances were similar, the libelants' contention would be made out beyond a reasonable doubt. There is, in fact, a reasonable doubt. It rests, however, solely upon the improbability that there could have occurred all the circumstances which would have made it possible for Bomhardt's act, in the first place, to have set off some dynamite, and, in the second place, to have set off so little as was in the first instance actually exploded. This consideration is entitled to great weight. Nevertheless, as the evidence seems to show that such a result of what he did is not impossible, it must be held that the libelants have made out their case to the extent that the law requires.

It remains to consider how far the facts already found entail liability on the various respondents.

### The Stevedoring Company.

The Stevedoring Company does not question that upon those findings it is responsible to such of the libelants as can show that they suffered by the explosion. It has expressly stated that it does not

desire to set up against any of them the defense that the act which did them harm was that of their fellow servant.

## Munson Line.

[1] The Munson Line had undertaken to transport coal and dynamite from Baltimore to Central America. For that purpose it had ordered the Chine to Baltimore. It had directed the Foard Company, as usual with its ships sailing from Baltimore, to act for it in such matters as required action in that city, and specifically to see that the shipment of dynamite was stowed on board. It did not exercise, or attempt to exercise, any control over the Foard Company as to whom the latter should employ to do the loading, or in what manner the loading should be done. For doing this work the Foard Company was to be paid a certain number of cents per ton of dynamite loaded and certain other fees and commissions. In short, the Foard Company was employed as an independent contractor to cause the dynamite to be loaded on the Chine. This was so whatever knowledge the Munson Line had or did not have of the independent existence of the Stevedoring Company, or whatever was its conceptions of the relations between the Foard and the Stevedoring Companies. Libelants say that nevertheless the Munson Line is liable for the consequences of Bomhardt's act, and that for three reasons:

(1) That the Foard Company was not reasonably competent to load dynamite and that the Munson Line had no sufficient cause to believe it competent.

The Foard Company, either by itself or through its subsidiary company, had for years done a large part of the stevedoring business of Baltimore. It had a high reputation for capacity and efficiency. It had previously loaded many cargoes of dynamite for the Munson Line and, so far as the record shows, without accident or trouble of any kind. It may be that it had not given sufficient study to the precautions which should be taken in the loading of dynamite, especially with reference to the selection of the individuals who were to do the loading or as to the discipline which it was necessary to maintain among them. Their standing and reputation, however, was at least as high as those of any other Baltimore concern.

There is nothing in the record to charge the Munson Line with having employed some one whom it either knew to be incompetent or whom it had reasonable ground to believe was otherwise than competent.

[3] 2. That the Munson Line caused dynamite to be handled in the harbor of Baltimore, and it thereby became responsible for all damage which might be suffered as the result of an explosion in that dynamite.

This alleged liability is based upon the assumption that the collection of large quantities of dynamite is in itself a nuisance, for any injurious results of which he who caused or maintained it must answer. This contention rests upon the doctrine enunciated in Rylands v. Fletcher, 3 House of Lords, 330, and in the cases which followed it. Judge Holt has so recently decided this question adversely to the libel-

ants that nothing further need be said upon the subject. The Ingrid (D. C.) 195 Fed. 596.

[4] 3. Libelants say that the handling of large quantities of dynamite in a frequented harbor is dangerous business. One who directs it to be done remains liable for the negligent acts of those who do it, although such negligence is that of the servant of an independent contractor. There are a number of conditions under which he who directs a thing to be done remains liable for any harm which results to others through the negligent doing of it. The fact that the work is being done by an independent contractor does not excuse him.

Some of these conditions need not be here considered. The Munson Line was not bound by statute or by contract to prevent accidents or to make good the damage which might happen because of the loading of the dynamite. Such cases as Hole v. Sittingbourne Railway, 6 H. & N. 488, and St. Paul Water Co. v. Ware, 16 Wall. 566, 21 L. Ed. 485, are therefore not in point.

The loading of the dynamite did not necessarily require the disturbance of the bed of any highway or the placing of any obstruction in it.

The discussion found in the opinions of the courts in Woodman v. Metropolitan Railroad, 149 Mass. 335, 21 N. E. 482, 4 L. R. A. 213, 14 Am. St. Rep. 427, Chicago City v. Robbins, 2 Black, 418, 17 L. Ed. 298, Id., 4 Wall. 679, 18 L. Ed. 427, Penny v. Wimbledon Urban Council, Law Reports (1899) 2 Q. B. Div., 76, and like cases, are instructive. They are not directly in point. Still less applicable are those which enforce the liability of one who causes lateral support to be withdrawn from his neighbor's foundation. Bonaparte v. Wiseman, 89 Md. 21, 42 Atl. 918, 44 L. R. A. 482.

The rule applicable to the class of cases with which we are now dealing is usually stated to be that the defendant is liable when he—

"directs an act to be done from which injurious consequences will result, unless means are taken to prevent them in the shape of additional work, but omits to direct the latter to be done as part of the work to be executed. * * * He is therefore not in the position of a man who has simply authorized and contracted for the execution of a work from which, if executed with due care, no injury can arise and who is therefore not to be held responsible if, while the work is going on, injury arises from the negligence of the contractor or his servants. * * * There is an obvious difference between committing work to a contractor to be executed from which, if properly done, no injurious consequences can arise, and, handing over to him work to be done from which mischievous consequences will arise, unless preventative measures are adopted. While it may be just to hold the party authorizing the work in the former case exempt from liability for injury resulting from negligence which he had no reason to anticipate, there is, on the other hand, good ground for holding him liable for injury caused by an act certain to be attended with injurious consequences if such consequences are not in fact prevented, no matter through whose default the omission to take the necessary measures for such prevention may arise." Lord Cockburn, Bower v. Peate, Law Reports, 1 Q. B. Div. 321.

In slightly different forms of words the same distinction has been made in numerous cases by state and federal courts in this country, as, for illustration, by Judge, now Mr. Justice, Holmes, in Woodman v. Metropolitan Railroad, supra. Mayor and City Council of Baltimore v. O'Donnell, 53 Md. 118, 36 Am. Rep. 395.

Lord Cockburn's language is quoted with approval by Judge Gray in the case principally relied on by libelants.  Doll v. Ribetti, 203 Fed. 593, 121 C. C. A. 621.  If it be a full statement of the applicable law, the Munson Line is not liable.

No additional work was required to be done in order to prevent the disaster.  This, according to the theory of the libelants, resulted from the doing of an affirmative act altogether unnecessary and highly reckless.  The rule is not infrequently put in different words.  It is said that he who directs the doing of dangerous work is liable for accidents which happen in its doing.  Sometimes courts who so say intend nothing more than to paraphrase Lord Cockburn's language.  The word "dangerous" in this connection may, however, mean different things.  It may be limited to undertakings which when executed skillfully and without any negligence whatever will or may endanger the person and property of another.  When so used, "dangerous work" means the kind of work, the responsibility for taking additional precautions to avoid the necessary consequences of which Lord Cockburn said could not be shifted.  It may mean work in the doing of which there is obvious likelihood that those who actually execute it will do carelessly something which must be done.  It may be both possible and customary to take in advance measures which will prevent injurious consequences from such easily foreseen negligence.  There are well-considered cases which hold that he who in the first instance directs that kind of work to be done and does not see that such precautions are taken is answerable for harm actually done and which such precautions would have prevented.

In Doll v. Ribetti, supra, the occupant of a building in Pittsburgh was held responsible for the injury done a passer-by by the fall of a man who was engaged in cleaning a fourth story window.  The evidence showed that in that city persons who were engaged at such heights in washing the outside of windows were usually protected by belts, the ends of which were secured in hooks placed in the sides of the windows for that purpose.  There were no such hooks in this case and the window cleaner was not in any way secured.  The occupant of the building might easily have made sure that he was.  He was directly employed by a concern which made a business of cleaning windows and had a contract with the defendant to clean them at fixed intervals.  The test of liability actually applied in this case is more severe than that laid down in Bower v. Peate, supra.  Cleaning the windows did not necessarily change anything or bring about any consequences which in themselves were dangerous unless guarded against.  There was danger, unquestionably, that a person cleaning the outside of such a window might fall to the pavement.

This case in its facts is, perhaps, not easily distinguished from that of Davis v. Whiting & Son Co., 201 Mass. 92, 87 N. E. 199.  There the owner of a building contracted to have some painting done on its building.  The painters were pulling up a scaffold upon which to work.  They negligently struck a shutter and knocked it out of place.  It fell to the sidewalk and injured a passer-by.  The jury found that the performance of the contract was necessarily attended with danger to

passers-by, yet it was held that the owner was not liable. It was said that the danger incident to doing difficult work where an injury may result from the lack of exercise of skill and care, or even from pure accident, is a different kind of danger from that for which the cases allow a recovery.

In such matters it is very difficult to draw the line. As was said by Judge Holmes in Woodman v. Metropolitan Railroad, supra, "exactly how far the principle should be carried is a question of nicety."

In Doll v. Ribetti the only danger to passers-by was that the cleaner would fall. He might fall, although he was not to any appreciable degree negligent. A simple precaution would have eliminated that danger.

In Davis v. Whiting & Son Co. the work was dangerous to the users of the streets only in that it afforded many opportunities for various sorts of negligence upon the part of the workman. Any of these might harm others. If the work was properly done, nobody would be hurt.

The adjective "dangerous" may have in this connection still a third significance. It may imply, not that there is any danger if the work be carefully done, and not that there is any special difficulty in doing it carefully, but merely that if anybody be careless the consequences to others may be grave.

In order to have held the defendant in Davis v. Whiting, it perhaps would have been necessary to give to the word "dangerous" its last meaning. That well-considered cases have not been willing to do. Where the danger is not inherent in the work done, but lies solely in the possibility that some one engaged in doing it will do any one of an indefinite number of careless acts, the defense of independent contractor, if otherwise available, is sufficient. The negligence in such cases is in the language of the authorities collateral or casual, and not inherent. They say it cannot be anticipated or guarded against.

There is nothing in this record to charge the Munson Line with notice that the stevedores employed by the Foard Company were permitted to use bale hooks, or, in point of fact, did use them. In the absence of such notice it could not reasonably have supposed that the Foard Company would put in charge of the work a man who would hit a box of dynamite with a cargo hook. There was nothing that it was called upon to guard against. It cannot be held liable for the consequences of Bomhardt's act.

### The Foard Company.

[2] The Foard Company denies liability. It says it did not employ Bomhardt. He served the Stevedoring Company. The latter was an independent contractor, for the defaults of whose servants the Foard Company is not answerable. It has already been held that such defense when applicable is sufficient.

The libelants, however, contend that the Foard Company stood in such a relation to the Stevedoring Company as to be responsible for the negligent acts of the latter's servants, whether the work in which

they were employed was or was not of a specially dangerous character, and that in any event the Foard Company must respond in damages for the consequences of what Bomhardt did because it knew that no effective measures were taken by the Stevedoring Company to prevent the use of bale hooks upon dynamite cases.

What were the relations between the Foard Company and the Stevedoring Company? Prior to July, 1910, the Foard Company had itself carried on an extensive stevedoring business. In that month it caused the incorporation of the Stevedoring Company. In the succeeding January at the annual meeting of the stockholders of the Foard Company the president stated that it had been deemed advisable from many standpoints to divorce the stevedoring business from the general business of the company and for that purpose the Stevedoring Company had been organized. The minutes of the Foard Company neither then nor subsequently made any further explanation as to what those standpoints were. The then president of the company died in June, 1911. No witness attempts to tell precisely what purpose the Foard Company had in mind other than may be inferred from the president's statement.

The authorized capital of the Stevedoring Company is $2,000. All this was subscribed for by three employés of the Foard Company. The stock was paid for in cash; the money being furnished by the Foard Company. The certificates of stock were issued to the nominal subscribers, but were by them indorsed in blank and delivered to the Foard Company, which has since held them all. No other person than the Foard Company has ever had any interest as stockholder in the Stevedoring Company. The three persons in whose names the stock stood have always been the sole directors of the company. One of them has been its president, another its secretary, the third its treasurer. At the time of its formation its president was the secretary of the Foard Company. Since October, 1911, the president, secretary, and treasurer of the Stevedoring Company have respectively held the like offices with the Foard Company.

When the Stevedoring Company was organized, the Foard Company sold it its stevedoring gear for $1,450. Some nine months after, the insurance policies on this gear were transferred from the name of the Foard Company to that of the Stevedoring Company. The Foard Company had regularly in its salaried employ a superintendent and certain other persons whose whole time was given to the stevedoring portion of its business. It habitually employed certain foremen of stevedores and quite regularly many individual longshoremen. These persons were, however, as a rule paid only for the time during which they were actually at work. Both these salaried employés and those who were paid for the work done were thereafter on the books of the Foard Company designated as employés of the Stevedoring Company. The change in the name of their employer was known to the salaried men, the foremen of the stevedoring gangs, and to many of the working stevedores. The identification checks given to the members of the gangs and the envelopes in which they received their pay hereafter bore the name of the Stevedoring Company. Some of the stevedores

examined at the trial testified, and doubtless with truth, that they supposed they were still working for the Foard Company. Such an opinion on their part was natural enough. Nevertheless it cannot be said as to them there was any holding out of the Foard Company as their employer.

When the Stevedoring Company was first organized, there were the usual corporate meetings for the purposes of organization. Since August, 1910, however, no meeting of either the stockholders or directors of that company has ever been held. It has never handled its own current funds. The expenses of doing its stevedoring business were paid by the Foard Company. The compensation for the stevedoring work it did was received by the Foard Company and deposited in the latter's bank account. The Stevedoring Company has never paid its officers any compensation. It has never paid anything for office rent, bookkeeping, or telephone service. All these were furnished by the Foard Company. The latter has always taken the greater part of the profits of the Stevedoring Company as compensation for its services in managing that company. The agreement under which this was done has never been reduced to writing. The witness who has been secretary and director of the Stevedoring Company since its organization, and for the last two years has been secretary of the Foard Company as well, frankly admits that he does not know what the agreement was. The gentleman who has been president of the Stevedoring Company since it was organized, and has for two years past been the president of the Foard Company, says he made the agreement verbally with Mr. Foard, the then president of the Foard Company. He states that the Stevedoring Company was to pay the Foard Company for soliciting business or throwing any business it could to the Stevedoring Company, or financing, to the extent that it deemed proper and prudent, a sum approximating the Stevedoring Company's net profits during the year. No figures were named. Precisely what was meant by a sum approximating the net profits is not defined.

It is highly probable that Mr. Foard never made his plans quite clear to any one else, if indeed they had been settled in his own mind. During his lifetime the Foard Company kept in its books only such accounts as showed what sums it had received for the Stevedoring Company and what disbursements it had made on account of that company. It did not there enter the payments that were made by the Stevedoring Company out of the $2,000 which had been orignally paid in for its capital stock. On December 31, 1910, the books of the Foard Company showed that the Stevedoring Company had made a net profit on operations of $6,517.40. This sum the Foard Company paid into the bank account of the Stevedoring Company and received from the latter a check for $5,000 "for securing, financing, and managing the business" of the Stevedoring Company for six months. The difference between these checks, $1,517.40, represented what the Stevedoring Company took for itself after compensating the Foard Company. Before the 30th of the next June Mr. Foard was dead. Whatever plan he had for determining the relations of the two companies to each

other died with him. Thereafter a new method of bookkeeping was adopted. In the bank account of the Stevedoring Company there never were but two deposits. The last of these was on the 4th of January, 1911, and against it there never were drawn more than nine checks; the latest in date being October 31, 1911.

After Mr. Foard's death the practice, or the form, of charging the Stevedoring Company a definite round sum for the Foard Company's services was abandoned, and at the end of every six months' period it was charged for services in managing, soliciting, and securing business precisely the amount of the net profits of the Stevedoring Company for the period, neither more nor less. All the Stevedoring Company payments were made by the Foard Company. If they were such payments as were convenient to be made by check they were made by the Foard Company's checks. When cash was required, as for pay rolls, the Foard Company drew the necessary amount of money out of bank. It was distributed in pay envelopes by the gentleman who was the treasurer of both companies. All entries of payments and disbursements were made upon the Foard Company's books. Upon the Foard Company's ledger there were ten accounts designated on account of General Stevedoring Company. Nine of these accounts had to do with various departments of the stevedoring business; as, for illustration, gear account, ore discharge account, foremen, and so on. Once every six months the balances of these accounts were combined into another account which was called "Current Account, Account General Stevedoring Company." This account showed the net gains or losses of the stevedoring operations for the six months. It was balanced when there was a profit by carrying the precise amount thereof into the profit and loss account of the Foard Company. When, as happened in the year 1912, there was a net loss, the account was closed by carrying that net loss as a charge against the profit and loss account of the Foard Company. Except in two particulars, the accounts of the Stevedoring Company were kept precisely as they necessarily would have been kept had the business been directly conducted by the Foard Company. These were: First, at the head of each of the accounts was written the words "Account General Stevedoring Company"; second, the current account was not absolutely essential if the Foard Company had been running the stevedoring business itself, but even then it would have been highly convenient as showing in one consolidated account on the books the net result of all stevedoring operations. It was never possible to take a trial balance of the Foard Company books without including the balances of the Stevedoring Company accounts. When the Stevedoring Company lost money, as it did, when the Foard Company paid out more for it than it took in, it was not treated on the Foard Company's books as a debtor of the Foard Company. The sum due by it was not included in the assets of the Foard Company as an account receivable. It was simply dealt with as it would have been had the loss been the loss of the Foard Company. There are no writings which define in what the "managing" for which the Foard Company charged consisted. Counsel for the company suggest that it was merely a somewhat inapt designation to cover the furnishing of the

services of the Foard Company's officers and employés, its bookkeeping, its telephone, and its office. It is probably utterly impossible for any one to say now of what it did consist or was supposed to consist. What Mr. Foard meant by it no one knows. Those who came after him quite clearly did not.

For nearly two years prior to the disaster the officers of the two companies were precisely the same. They never thought, and in the nature of things never could think, in what capacity they were acting at any particular time, whether as the officer of one company or that of the other. Much stress is laid on the fact that the bills for stevedoring services were always rendered on the bill heads of the General Stevedoring Company and that it had letter heads of its own. On the other hand, letters written upon the Foard Company's letter heads to the Munson Line and in evidence in this case show not only that the Foard Company discussed the stevedoring rates with the Munson Line precisely as it would have discussed them had the Foard Company been doing the stevedoring business directly, but that it used repeatedly such expressions as "our outward stevedoring bill," "our people would really have to have more money for loading your ships," "we have charged," "our Mr. Wagner" (he was nominally the superintendent of the General Stevedoring Company), "our superintendent," stevedoring "cost us," "our foreman advises," "we make it a practice before commencing loading or discharging a vessel to inspect her gear both for the protection of our stevedoring organization and for the protection of the ship and other interests," "we will be glad to put on our stevedoring organization at about 22 cents per ton." Mr. Bromell of the Munson Line, for whom the Foard Company handled on an average perhaps a ship a week, said he always understood that the Foard Company was doing the stevedoring work, although he did remember that the Foard Company when submitting vouchers for their accounts would sometimes attach stevedoring bills made out on the bill heads of the General Stevedoring Company and to that company. On the other hand, the stevedoring licenses required to be taken out by the City Code were taken out in the name of the president or superintendent of the Stevedoring Company as such, and city and state taxes were regularly paid upon its capital stock.

Upon this state of facts, is the Foard Company liable for the consequences of Bomhardt's negligence?

It says that Bomhardt was not in its employ, and unless he was it is not liable for what he did. Standard Oil Co. v. Anderson, 212 U. S. 220, 29 Sup. Ct. 252, 53 L. Ed. 480; Murray v. Currie, Law Reports, 6 Common Pleas, 24.

The Stevedoring Company was duly incorporated. It was a legal entity. It had a life separate from that of the owner of its stock. Old Dominion Copper Co. v. Lewisohn, 210 U. S. 212, 28 Sup. Ct. 634, 52 L. Ed. 1025.

The fact that the Foard Company was the sole owner of the stock of the Stevedoring Company did not make it liable for its acts or defaults. Saloman v. Saloman & Co., Law Reports (1897) Appeal Cases, 22.

That the same individuals served both companies did not make one company responsible for the acts of an officer committed in the course of the discharge of his duties to the other. Peterson v. Chicago, Rock Island & Pacific R. R. Co., 205 U. S. 364, 27 Sup. Ct. 513, 51 L. Ed. 841.

The statement made by the Court of Appeals of Maryland in Swift v. Smith, 65 Md. 428, 5 Atl. 534, 57 Am. Rep. 336, that the purchase by a single person of all the stock of a corporation for the time being virtually suspends its operation as a corporation is said to have been unnecessary to the decision in that case. It is argued that it never had any other foundation than the assumed impossibility of holding a corporate meeting when there was only one person qualified to meet. That there is such an impossibility is asserted to be now an exploded idea. East v. Bennett, Law Reports (1911) 1 Chancery, 163.

The decision of this case does not require the discussion of any of these propositions nor of their limitations if they have any. The acquirement by a single individual or corporation of all the stock of another corporation does not suspend the corporate life. It may not even raise a presumption that such life is so suspended. The sole owner of all the stock of a corporation may suspend its corporate life if he be so minded, at least in so far as its separate existence is a protection to him. Without so suspending it for all purposes he may take into his hands such part of the corporate activities as to make himself responsible for the consequences of some of the things which may be in a sense done in the corporate name. One who does not own all or any of the stock of a corporation may do things which will entail such liability upon him.

Since the death of Mr. Foard, if not before, the corporate life of the Stevedoring Company has been in large part suspended. It never in due form took any corporate action. Neither its directors nor its stockholders ever came together. Since October, 1911, it has never handled a dollar of money, unless the handing by its superintendent to its stevedores of pay envelopes which had been filled by the Foard Company can be said to be handling money.

The distinction between a corporation and the owner of all the stock in the corporation is in one sense at all times formal rather than of the substance of things. It appears more unreal than ever when contrasted with such verities as the destruction of tens, if not hundreds, of thousands of dollars' worth of property, the wounding and maiming of suffering human bodies, and the extinguishment of 30 lives. Nevertheless, the legal fiction of the separate being of the corporation serves many highly beneficial purposes in modern life. It is for the Legislature to say when and how such artificial existences may be called into being. When the requirements so imposed have been met, the courts must recognize and uphold the distinction between the corporation and its stockholders. Saloman v. Saloman & Co., supra.

It is, however, not asking too much to require that those who would seek protection behind the corporate form shall themselves respect the corporate existence. In such cases as those with which we are dealing it is not unfair to require something more than paying a few dollars annually as taxes on corporate stock, having the corporate

title inserted in the stevedoring license, which in any event would have had to have been obtained, printing the corporate name on some bill heads, letter heads, and pay envelopes, stamping it on some metal checks, and writing it at the top of some accounts, kept otherwise precisely as they would in any event have been kept. There may be circumstances under which those things, or even some of them, would be sufficient. In this case they are not. It may be that having corporate meetings, receiving its own earnings, and then disbursing them as dividends, are very formal things. They are matters of ritual rather than of substance. But it is not open to these who rely upon the defense the Foard Company here sets up to make light of such formal and ritualistic observances. It accepted large payments for managing the Stevedoring Company. It actually managed it in every conceivable way. Whether it be held that the Foard Company suspended the corporate life of the Stevedoring Company and took its place, or whether what was done be described as the Foard Company's taking over the business of the Stevedoring Company and carrying it on upon an agreement that it was to get all the profits, if any were made, and to pay all the losses if any were suffered, the result will be the same.

The Foard Company must be held liable for the consequences of Bomhardt's negligence.

It is clearly established that the Foard Company was well aware that its stevedores occasionally used bale hooks on dynamite cases. Sometimes orders were issued against the use of such hooks, but to the knowledge of the Foard Company no real and vigorous attempt to enforce them were made. Doubtless a bale hook may be used upon a box of dynamite in a perfectly safe way. The evidence produces an abiding conviction that it is unsafe and improper to permit the use of such hooks by the kind of men who are either the members or the foreman of ordinary longshoremen gangs. The evidence of Mr. Slack, the president of both the Foard and the Stevedoring Companies, leads to the conclusion that the Foard Company undertook the handling of dynamite with a somewhat insufficient inquiry as to all the dangers which should be guarded against and as to the best way to ward them off. It did make inquiries. It does not seem to have gone to the original or best sources of information upon such questions, nor to have made certain that it obtained precise information as to the practice which had been followed by those most experienced in the handling of dynamite and other explosives. Such lack of proper study of the subject did not contribute to the disaster except to the extent to which it may have played its part in leading the Foard Company to tolerate the use of bale hooks. As already pointed out, the liability of that company rests on other grounds than its mere knowledge that they were used.

Like the Stevedoring Company, the Foard Company expressly declines to set up the defense that some of the libelants were Bomhardt's fellow servants. All its assets will be insufficient to meet the claims of those against whom the defense of fellow servant cannot be made. It feels that those who were actually doing the work, or the de-

pendents of those who are dead, have suffered as much and are as much entitled to such compensation as may be made as are any of the others who were injured.

## The Steel Company.

[5] Those of the libelants who seek recovery from the Steel Company do not charge that it had any part in bringing about the explosion. They say, however, that they were its employés; that it was bound to furnish them with a reasonably safe place in which to work; that it violated this obligation to them when it anchored the Jason within 1,200 feet of the dynamite laden vessel. An explosion followed. They were hurt. They are entitled to recovery from their employer.

This contention seems to assume that the collection of dynamite in large quantities is a nuisance. If it is not, there would seem to be no legal obligation upon any one to keep away from its vicinity. In any event, the Jason was anchored in the designated anchorage grounds. It can hardly be said that as a matter of law other vessels must vacate those grounds during all times in which a dynamite ship is anchored in them upon peril of becoming liable to all on board for such damage as may be done by an explosion.

No recovery can be had against the Steel Company.

## City.

Some of the persons for whose wounds or death a recovery is sought against the city were members of the longshoremen gang stowing the dynamite. The city denied its liability to them. It raised the question by exceptions to their libels filed against it. These exceptions were sustained. The reasons for so doing were fully stated in Zywicki v. Joseph R. Foard Co. et al. (D. C.) 206 Fed. 975. They need not be repeated here.

[6] Others who have brought their libels against the city were not on the Chine and were not in any way concerned in loading the dynamite. They or their possessions were at the time of the explosion lawfully upon the navigable waters of the Patapsco. They say that the city is liable to them because of what it did and also because of what it did not do. The sin of commission was the sending of the Chine to load in a place which was dangerous to others. Prior to February, 1911, ships which carried dynamite from Baltimore took it on board at the railroad piers. The great explosion at Communipaw then took place. The municipal authorities were alarmed. They insisted that the loading of ships with such explosives should thereafter be done at a greater distance from the city. They named the quarantine anchorage as the place. The Foard Company, without conceding the authority of the city to give such direction, obeyed it. Thereafter the dynamite laden cars were placed on car-floats and towed to quarantine. Their contents were there transferred to the ships. Libelants claim that this place was unsuited for the purpose. In their view handling dynamite there caused unnecessary danger to persons and property. They contend that the city is answerable for the consequences. No state legislation can relieve it of liability.

Workman v. New York City, 179 U. S. 552, 21 Sup. Ct. 212, 45 L. Ed. 314.

It may be assumed·that it cannot. In this case it is unnecessary so to decide.

As has already been pointed out, the handling of dynamite for a lawful purpose is not in itself a nuisance. The Interstate Commerce Commission is authorized by statute to regulate the transportation of explosives by interstate railroad carriers. They have exercised the authority. In so doing they declare:

"As the use of certain explosives is essential to various business activities throughout the country, it is the duty of interstate railroad carriers to transport such explosives under proper regulations."

It may well be that whoever selects a place for the loading of dynamite is bound in so doing to use due and reasonable care. In choosing the locality for such handling more than one factor must be taken into account. The car-floats cannot safely be required to traverse waters liable to be roughened by wind or tide. To avoid risk of collision in fogs or from other causes, their trips along much used channels should be short. The transfer should be made where both ship and float can lie in smooth water. The loading should be done where such an accident will do the minimum of harm. It should not be near a thickly peopled shore. The ideal spot would be one very near the city but within half a mile of which nobody ever comes. Like most other ideals, it cannot be attained. In trying to come as near to it as possible the city must use due care and exercise sound judgment. If it does, the fact that it named the place does not make it responsible to those who may be injured by an explosion. It matters not that after the event a judge or a jury may think that, all things considered, it is possible that a better choice might have been made. Upon the facts here in evidence the city seems to have chosen wisely. In any event, the selection was made by a competent official acting with due care and in good faith. The city incurred no liability thereby.

[7] The fault of omission is said to consist in a failure to exercise the authority conferred upon the city by the General Assembly of Maryland by the Act of 1908, c. 148, p. 585. The relevant portions of that statute declare that the city shall have the power "to provide for the preservation of the navigation of the Patapsco river and tributaries, * * * and the removal therefrom of anything detrimental to navigation or health. To provide for and regulate the stationing, anchoring and moving of vessels or other water craft, and to provide for the appointment of such officers and employés as may be necessary to execute the aforegoing powers."

But for this enactment the city could exercise no authority over the spot at which the explosion took place. That was several miles outside of the corporate limits. It was, however, on the Patapsco river, and therefore upon the waters over which by the act in question the city's jurisdiction was extended for the purposes therein specified. The Circuit Court of Appeals for this circuit has held that the power thereby given imposed obligations as well. State of Maryland, Use of Pryor, v. Miller, 194 Fed. 775, 114 C. C. A. 495.

Miller had obtained a permit from the city to erect a bulkhead in the navigable waters of the Patapsco. He had caused piles to be driven. In the usual manner he had sawed off their tops some inches below the water line. He had failed to cap them. He left them for six weeks or more a danger to navigation. A launch struck them. Five people were drowned and some others injured. It was ruled that the city was liable for the consequences of such an obstruction placed or allowed to remain in the waters of the Patapsco river with its knowledge, or opportunity of knowledge, or by and with its authority and consent, precisely as it would have been for the damage done by a nuisance allowed upon a street or other highway. The opinion in that case was handed down on the 15th of December, 1911. Some three months later the Legislature of Maryland by the Act of 1912, c. 32, attempted to add a new section to the Code of Public Local Laws relating to Baltimore City. This section reads:

"Provided, however, that except in regard to docks and wharves owned by the mayor and city council of Baltimore, nothing contained in any section or provision of this article shall be construed to impose any duty upon the mayor and city council of Baltimore to any person or corporation using the Patapsco river, or any branch or tributary thereof, in regard to the safety thereof, or to render the said mayor and city council of Baltimore liable for any loss of life or injury or damage to person or property by reason of any obstruction in, or unsafe condition of, any part of said river or of said branches or tributaries, or either of them."

The libelants contend that this act is invalid as being in conflict with both the provisions of section 29 of article 3 of the state Constitution, which declares, among other things:

"That every law enacted by the General Assembly shall embrace but one subject, and that shall be described in its title."

They say that the act, besides adding the new section to the Code of Public Local Laws, also dealt with the powers of the city to regulate the use of streets and sidewalks, telegraph, trolley and electric light poles, telegraph and electric light wires, and the planting, trimming, and destroying of trees. It changed the laws with reference to the abatement of taxation for the purpose of encouraging manufacturers. In a number of important respects it recast the law governing the condemning and opening of streets and the court procedure in such matters. It established a municipal ferry. These various subjects were about as unrelated as they could be. Their sole bond of connection was that they all involved changes in the Code of Public Local Laws relating to Baltimore City.

Obviously there were various provisions of the city charter and of the local laws which the municipal authorities desired to amend. They threw these various amendments, though they related to many different and incongruous subjects, into one act. Many of them are not a part of the municipal charter. They are state laws whose operation is limited to municipal territory. In Maryland there are 24 such local codes. In the statute in question are provisions amending both the municipal charter proper and the local code.

Baltimore City contains five-twelfths of the population of the state and more than half of its wealth. The Code of Local Laws relating

to it has about 900 sections. They deal with all sorts of matters. Some of them impose upon individuals penalties for offenses which may amount to imprisonment for more or less considerable, though usually relatively brief, periods; others relate to property matters and interests of great value and importance. An act which avowedly is intended to amend and re-enact as a whole the local code or the city charter, or both together, puts every one on notice. The one under consideration does not profess to be and is not a comprehensive amendment or re-enactment of either. It is merely a series of unrelated measures changing various provisions in each. It offends against the spirit, and perhaps against the letter, of the constitutional provision.

The libelants are equally insistent that the title of the act of 1912 does not describe, or in any way indicate or even suggest, that anything in it was intended to modify the provision of chapter 148 of the Acts of 1908. It is true that in the body of the act two attempts to effect this modification are made. The second of these in the order in which they appear in the act is the provision for adding the new section 469, already quoted, to the Code of Public Local Laws. The first is in the portion of the act which immediately follows the enacting clause. A copy of the act of 1908 with the insertion of three words in one place and the addition of a proviso which is in substance identical with the new section 469, but the phraseology of which is slightly different, is there inserted. How this re-enactment of the act of 1908 with amendments came into the act of 1912 does not appear. At first blush it might seem that it was the form in which the Legislature intended to re-enact sections 828 and 829 of the Code of Public Local Laws, for the sentence of the enacting clause immediately preceding the copy of the act of 1908 is "and that sections 828 and 829 of article 4 of the Code of Public Local Laws of Maryland, title 'City of Baltimore,' subtitle 'Miscellaneous Laws,' be and they are hereby repealed and re-enacted with amendments so as to read as follows.". Quite obviously, that was not the legislative meaning, for sections 828 and 829 in their re-enacted form are found at the very end of the act of 1912. Conceivably two acts amending the act of 1908 may have been drafted. An attempt may have been made to combine them in one measure and in the effort some clerical blunders were made. However that may be, in the title itself there is no reference to any purpose to repeal and re-enact chapter 148 of the Acts of 1908. There is no indication that the Legislature intended in any wise to deal with the city's liability for torts on the waters of the Patapsco and its tributaries. The only reference to the new section to be numbered 469 is the statement in the title that one of the purposes of the act is "to add a new section to article 4 of the Code of Public Local Laws of Maryland, title 'City of Baltimore,' subtitle 'Miscellaneous Local Laws,' under the heading harbor, docks and wharves as amended by the Act of 1908, chapter 170, said new section to be numbered 469 and to follow 468." Chapter 170 of the act of 1908 related to the harbor board and to some extent to its power over wharves, etc. It did not deal with the same matters as those

with which chapter 148 were concerned. Section 468 of the Code of Public Local Laws, after which the new section is to come, provides a penalty on any vessel which lies at a wharf in such manner as to improperly obstruct another vessel.

The constitutional requirement in question has been many times considered by the Court of Appeals of this state. From the nature of the subject it has been difficult or impossible to lay down any very definite rule of interpretation. It is mandatory in its requirements, but such construction will be given to it as not unduly to hamper or limit the Legislature.

If several sections of the law refer to and are germane to the same subject-matter which is described in its title, it is considered as embracing a single subject and as satisfying the requirements of the Constitution in this respect. Baltimore v. Reitz, 50 Md. 574; State v. Loden, 117 Md. 384, 83 Atl. 564, 40 L. R. A. (N. S.) 193.

It was intended to exclude all foreign, irrelevant, or discordant matter from the statute and to confine the statute to the single subject disclosed in the title. The Court of Appeals has on many occasions stricken down legislation because of the failure of the title to conform to the constitutional requirement. Curtis v. Mactier, 115 Md. 388, 80 Atl. 1066; Kafka v. Wilkinson, 99 Md. 238, 57 Atl. 617.

The objection thus made to the constitutionality of the act of 1912 is obviously serious. Unless the case imperatively requires, a federal court will not adjudge a state statute to be in conflict with the Constitution of the state before that question has been considered by the state tribunals to which it properly belongs. Louisville & Nashville Ry. Co. v. Garrett, 231 U. S. 305, 34 Sup. Ct. 48, 58 L. Ed. ——.

Libelants say that the act in question is in any event invalid because it is in conflict with the Constitution of the United States. They argue that the right to recover full compensation for wrongs suffered may not be taken away. They cite various cases which held invalid an act of Congress exempting military officers from liability for false arrest as well as certain state enactments limiting recovery in libel actions against newspapers to the actual pecuniary damage suffered or prescribing maximum sums for which in suits for personal injuries a judgment might be given. Griffin v. Wilcox, 21 Ind. 373; Park v. Detroit Free Press, 72 Mich. 560, 40 N. W. 731, 1 L. R. A. 599, 16 Am. St. Rep. 544; Passenger Ry. Co. v. Boudrou, 92 Pa. 481, 37 Am. Rep. 707.

If the Legislature had attempted to relieve the city from liability for something it had done or affirmatively permitted to be done, such decisions might be more or less in point.

The liability of the city of Baltimore in this case, however, rests entirely upon the grant of authority made by the act of 1908 and upon the assumption that the Legislature when it gave the power intended to impose the correlative duty. The principles laid down in the cases above cited may be sound and it may be competent for the Legislature to say to the city: "You may exercise, if you see fit, certain powers; but if you do not see fit to exercise them you will not be liable for failure so to do." It may be that it would be beyond the legis-

lative competence to tell the city, "You may exercise these powers, but if you do exercise them to any one's hurt you shall be free from liability." It may be argued that the Legislature could not permit the city to employ some one to do something for its convenience or permit some one to do something for his own, without taking proper precautions to prevent injury which, from the nature of the thing to be done, would happen unless such precautions were taken; as, for example, perhaps the Legislature might not be free to authorize the city to permit some one to drive a pile in navigable water and yet relieve the city from all obligation to see to it that the necessary precautions were taken to prevent such pile from becoming an obstruction to navigation.

As has already been seen, whoever directs such work to be done remains liable for the failure of any employé of those doing the work to take such precautions. In this case, however, no expression of opinion on such questions is required. The alleged defaults of the city now under consideration are not those of commission, but of omission. The city of Baltimore did not direct the shipment of dynamite to Panama. As a lawful article of interstate commerce it is at least doubtful whether it could have prevented such shipment if it had wished to do so.

It has been already shown that the city is not liable merely because it designated the place at which the Chine should lie to take dynamite on board. In no proper sense did the city either cause or permit the loading of the dynamite. The power of the Legislature to absolve the city from liability for anything which it has done is not involved in this case.

Before passing upon the contention that the act of 1912 is in conflict with the Constitution of Maryland, it will be necessary to inquire whether the city would have been liable had the statute of 1908 remained unchanged. The argument for the libelants is that the act last mentioned gave the city power to regulate such loading, and that for any damage which resulted from failure effectively to exercise that authority it is liable. It is doubtful whether the act in question confers upon the city the power to regulate the loading of ships wherever it is possible that accidents may happen in the course of such loading which may endanger persons using navigable waters. There is no such grant in specific terms. Libelants rely on the language "to provide for the preservation of the navigation of the Patapsco river and tributaries, including the establishment of lines throughout the entire length of said Patapsco River and tributaries, beyond which line no piers, bulkhead, wharves, pilings, structures, obstructions or extensions of any character may be built, erected, constructed, made or extend and to provide for the improving, cleaning and deepening of said river and tributaries, and the removal therefrom of anything detrimental to navigation or health." They say that to preserve navigation and to remove anything detrimental thereto or to health includes the authority to regulate the loading of explosives. The collocation in which those two phrases are used, however, seems strongly to suggest that what the Legislature had in mind was to confer upon the

city the power to prevent obstructions being put in the harbor and to remove such obstructions to health and navigation as might at any time exist in it.

In the absence of congressional legislation upon the subject, the state may doubtless authorize its municipalities to regulate the loading of explosives even upon vessels bound to foreign ports. To some extent Congress has acted in this matter. It has provided for the regulation of the transportation of such explosives by interstate carriers by rail. There are some federal statutes relating to the transportation of such explosives upon the water, as, for example, sections 4472, 5353, 5354, and 5355, of the Revised Statutes (U. S. Comp. St. 1901, pp. 3050, 3637, 3638). The last has been amended by the Act of February 27, 1877, c. 69, 19 Stat. 252, and the Act of February 20, 1901, c. 386, 31 Stat. 799 (U. S. Comp. St. 1901, p. 3050). Whether the failure of Congress to do more is to be understood as an expression of its judgment that enough had been done need not be here inquired into.

According to libelants' theory the disaster happened because Bomhardt struck a box of dynamite with a bale hook. If the city is liable at all, it must be because it failed to do something which would have prevented such use of the hook. Libelants say it might have required all persons employed in handling dynamite, or all persons having charge of gangs of men engaged in such handling, to establish in some way their fitness to do the work carefully and skillfully. They argue if such requirements had been in force Bomhardt would not have been in charge of the handling of this dynamite. Bomhardt is loud-mouthed; he is not a teetotaler; it is possible, although not proved, that on occasion he may have even become intoxicated, but he certainly was not a drunkard. He doubtless could have shown quite as many qualifications for taking charge of men engaged in loading dynamite as municipalities usually require of those who seek municipal office or employment of similar grades. It is suggested that, if he had been required to obtain a permit, the danger of handling dynamite, and especially of using in the handling such instruments as bale hooks, might have been brought more forcibly to his attention. The liability of the city cannot be made to depend on mere possibilities of this character. It is argued that the city was bound to enact an ordinance prohibiting the use of bale hooks. After almost every disaster it appears that a contributing cause was the doing of something which might have been forbidden if the authorities had thought to forbid it. Does every such failure of the municipality to anticipate that individuals on private property will conduct their business in some way from which an accident may result entail upon it liability to all persons on the highways who are injured by an accident so produced? No cases have been cited which go to any such length. The degree to which regulation of industry may be wisely pushed may frequently be a question of great doubt and difficulty. It may be highly to the advantage of the public that the municipality shall be given powers of regulation. Many municipalities will be compelled to decline such powers if the taking of them imposes an obligation

to use them in every way which will tend to prevent accident to those traveling the highways, no matter how costly, or, from many standpoints, impolitic, the imposition of such regulations may be. Municipalities may be required to keep the highways free of dangers and obstructions. That may well involve an obligation to compel abutting proprietors to remove from their premises conditions which constitute an obvious menace to the safety of those using the highway. Havre de Grace v. Fletcher, 112 Md. 562, 77 Atl. 114. It does not require a municipality at its peril to regulate and inspect industries carried on on ships or in factories for the purpose of preventing the doing of foolish or reckless acts which may result in damage to passers-by.

In this case it is by no means certain that municipal inspection would have prevented the accident unless it had gone so far as to prohibit any handling of dynamite except in the immediate presence of the official inspectors. Whether such a rigid system of inspection is required is a matter for the people, acting through their municipal or legislative representatives rather than for the courts.

It follows that as against the city the libels must be dismissed.

### Conclusion.

The conclusions here reached are disastrous to the Foard Company. They will give little satisfaction to the libelants. The findings of fact as to the cause of the accident and the relations between the Foard and the Stevedoring Companies require a decree which will sweep away all the accumulations of years of honest industry. To the Foard Company this must seem very hard. Those connected with it do not believe that the accident could have been caused by Bomhardt. They do not see how they could have done anything other than they did except to have made sure that bale hooks were not used at all. They do not think the bale hook had anything to do with the catastrophe; but, if there had been no bale hooks there, libelants' witnesses could not have thought otherwise. To them the Foard Company seems called on to pay a high price for a very trifling error of judgment. On the other hand, if the decree here made shall be affirmed above, all that the Foard and the Stevedoring Companies have will make good to the libelants but a fraction of what they have lost. It is no comfort to them to tell them that dynamite is necessary to modern industry. Few of them had an appreciable interest in shipping the dynamite to the Isthmus. Many of them had none at all except that which they shared with everybody else. What happened at Communipaw and to the Chine shows how widespread disaster an explosion of dynamite may cause. That they should bear the loss does not seem fair to them. It is natural that they should feel that every one who had a part in causing the dynamite to be stowed on the ship should be liable to them. On the other hand, what has been said shows that it does not seem to be in accordance either with natural justice or with settled legal principles to make every one who has any part in the handling of the dynamite answerable for all the consequences of an explosion, although he was not in fault either in person or through some one for whom under the ordinary rules of law he

must answer. It may be that some day the law will be so moulded that more exact and complete · equity may be done. Public opinion has apparently come to the conclusion that workmen should be indemnified against the pecuniary consequences of accidents suffered by them in the course of their employment. Hereafter a step further may be taken. It may then seem just to compensate all persons who without fault of their own suffer from industrial accidents. Such a policy may be wise. Even if it be, courts would not be now justified in holding liable for the consequences of the accident him who directs the shipment of an explosive or who knowingly and willfully takes any part in such shipment or permits it having power to prevent it. Whether indemnification shall be given at all, and if so how, is a complex problem. It is for the Legislature to work out. In this case the court may not impose the burden upon either the city or upon any person or corporation who was no more directly responsible for the explosion than was the Munson Line.

It follows that the libels against the Munson Line, the Steel Company, and the city must be dismissed, and that both the Stevedoring and the Foard Companies must be held liable to all persons who have suffered legal damage as the result of the explosion, and who have filed their libels in this case. In some instances an agreement as to the amount of these damages may be arrived at. In others time and expense may be saved by assessing them in open court. For still others a reference may be necessary.